**In re ARMORED CAR ANTITRUST LITIGATION.**

**Civ. A. No. 78–139A.**

United States District Court,
N. D. Georgia,
Atlanta Division.

April 18, 1979.

William L. Harper, U. S. Atty., John T. Orr, Jr., Atty., U. S. Dept. of Justice, Antitrust Div., Atlanta, Ga., for United States.

Baxter L. Davis, Davis, Matthews & Quigley, Atlanta, Ga., for Food Fair Stores, Raley's Corp., L.D.C., Inc. and Liberty Coin Shop.

Harold E. Kohn, Dianne M. Nast, Kohn, Savett, Marion & Graf, P. C., Philadelphia, Pa., for Food Fair Stores and Philadelphia Electric Co.

Emmet J. Bondurant, II, Trotter, Bondurant, Griffin, Miller & Hishon, Atlanta, Ga., Samuel W. Murphy, Jr., Donovan, Leisure, Newton & Irvine, New York City, Lewis A. Noonberg, Piper & Marbury, Baltimore, Md., for Brink's, Inc.

D. R. Cumming, Jr., Sutherland, Asbill & Brennan, Atlanta, Ga., William E. Willis,

Sullivan & Cromwell, New York City, John Henry Lewin, Jr., Venable, Baetjer & Howard, Baltimore, Md., for Wells Fargo Armored Service Corp.

Elwood S. Kendrick and Nancy Miller Bennett, Kendrick, Netter & Bennett, Los Angeles, Cal., J. J. Brandlin, Brandlin & McAllister, Los Angeles, Cal., for Raley's Inc.

John E. Burke, Richard J. Rappaport, Ross, Hardies, O'Keefe, Babcock & Parsons, Chicago, Ill., for L.D.C., Inc. and People Gas, Light & Coke Co.

John C. Staton, Jr., Curtis L. Frisbie, Jr., King & Spalding, Atlanta, Ga., Dennis G. McInerney, Cahill, Gordon & Reindel, New York City, for Purolator, Inc.

John M. Sikes, Jr., Jay I. Solomon, Zusmann, Sikes, Pritchard & Cohen, Atlanta, Ga., David Berger and H. Laddie Montague, Jr., Berger & Montague, Philadelphia, Pa., Milton J. Wallace, Wallace & Breslow, Miami, Fla., Seymour Kurland and Judah I. Labovitz, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for Biscayne Bank.

Howard A. Specter, Michael D. Buchwach, Pittsburgh, Pa., for Liberty Coin Shop.

Litman, Litman, Harris & Specter, P. A., Pittsburgh, Pa., for Liberty Coin Shop, Kleinman, Steinberg & Lapuk and Specks & Goldberg, Ltd.

Eugene F. McShane, Paul L. Binder, Asst. Attys. Gen., Antitrust Section, Columbus, Ohio, for the State of Ohio.

Patricia A. Cutler, Deputy Atty. Gen., San Francisco, Cal., for State of California.

David B. Goldstein, Asst. Atty. Gen., Antitrust Section, Economic Protection Div., Phoenix, Ariz., for the State of Arizona.

Howard F. Naughton, Jr., Exxon Company, U. S. A., Houston, Tex., for Exxon & Esso.

Peyton S. Hawes, Jr., Robert S. Jones, Cofer, Beauchamp & Hawes, Atlanta, Ga., for Atlantic Richfield Co.

Jack L. Ratzkin, Federated Department Stores, Cincinnati, Ohio as member of class.

John E. Grasberger, Pittsburgh, Pa., David W. Porter, Morris, O'Brien, Manning & Brown, Atlanta, Ga., Granvil I. Specks, Chicago, Ill., for Kleinman, Steinberg & Lapuk and Specks & Goldberg, Ltd.

Specks & Goldberg, Ltd., Chicago, Ill., pro se and for Kleinman, Steinberg & Lapuk.

Guido Saveri, Saveri & Saveri, San Francisco, Cal., for Saveri & Saveri.

Theodore W. Flowers, Francis P. Devine, III, Ronald J. Restrepo, White & Williams, Philadelphia, Pa., for Central Penn Natl. Bank.

William J. Scott, Atty. Gen., State of Illinois, John E. Noel and Lee H. Weiner, Asst. Attys. Gen., Chicago, Ill., for State of Illinois.

Arnold Levin, Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa., Fred W. Phelps, Topeka, Kan., for Weston L. Sampson.

Bernard M. Gross, Warren Rubin, Philadelphia, Pa., for Sunshine Stores, Inc.

David I. Shapiro, Dickstein, Shapiro & Morin, Washington, D. C., for Sunnydale Farms, State of Connecticut, Commonwealth of Massachusetts and Hillmans, Inc.

Kleinman, Steinberg & Lapuk, Marvin H. Lapuk, Daniel E. Kleinman, Hartford, Conn., for State of Connecticut.

Joseph M. Wells, Philip B. Hill, Chicago, Ill., for Peoples Gas, Light & Coke Co.

John D. Ashcroft, Atty. Gen., Roger Bern, Walter O. Theiss and Nanette Laughrey, Asst. Attys. Gen., Jefferson City, Mo., for State of Missouri.

Stephen D. Susman and Terrell W. Oxford, Mandell & Wright, Houston, Tex., for Brazosport Bank of Texas.

Francis Bill Burch, Atty. Gen., Timothy J. Shearer, Asst. Atty. Gen., Baltimore, Md., for State of Maryland.

## ORDER

RICHARD C. FREEMAN, District Judge.

This multidistrict antitrust class action is presently before the court on plaintiffs' motion seeking approval of a proposed settlement of the litigation, Rule 23(e), Fed.R. Civ.P. Attendant to this evaluation, the State of California, a class member object-

ing to the settlement proposal, has moved to reopen discovery on the issue of damages and has requested the court's appointment of an expert to aid resolution of conflicting economic opinion evidence. Additionally, in the event that settlement is approved, plaintiffs' counsel have filed a joint petition for recovery of fees and expenses. Also if the settlement were approved, the court would schedule preparation, briefing, and argument of a plan of distribution of the settlement fund. As preliminaries to our review and evaluation of the settlement, the court will offer: (1) a brief recapitulation of the proceedings to date; and (2) a short description of the affected industry.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 21, 1977, a federal grand jury sitting in the Northern District of Georgia returned indictments charging two corporations, Brink's, Inc. and Wells Fargo Armored Car Service Corp. and six corporate officers, with violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *United States v. Brink's, Inc., et al.,* Cr. No. 77–207A (N.D.Ga.); *United States v. Edgar A. Jones, et al.,* Cr. No. 77–208A (N.D.Ga.). In particular, the indictments charged the defendants with combining and conspiring during a period from early 1968 through August 1975 in order to allocate customers and to rig bids and price quotations. These violations, it was alleged, had the effect of restraining trade and artificially inflating prices of armored car services. On April 21, 1978, the defendants' pleas of *nolo contendere* to the charges contained in the two indictments were accepted and approved. Defendant Wells Fargo appealed, but the

Fifth Circuit affirmed the judgment, *United States v. Wells Fargo Armored Car Service Corp.,* 587 F.2d 782 (5th Cir. 1979).

On June 21, 1977, simultaneous with the return of the indictments, the Government filed a civil enforcement action against the two corporate defendants and thereby sought to enjoin defendants' continuing or future violations of the Sherman Act, *United States v. Brink's, Inc., et al.,* C.A. No. 77–1027A (N.D.Ga.).[1] Predictably, within sixty days of the Government's initiation of the criminal and civil enforcement actions several private parties and states attorneys general filed treble damage actions, 15 U.S.C. § 15, against Brink's, Wells Fargo, and a third armored car service, Purolator Security, Inc.[2] The civil complaints filed in this and other district courts tracked the language of the criminal indictment and charged defendants with unlawful market allocation and bid-rigging practices from 1968 through 1975. Many of the plaintiffs sought relief on behalf of a statewide or nationwide class of the defendants' customers.

Defendant Wells Fargo petitioned the Judicial Panel on Multidistrict Litigation for identification and transfer of all the civil actions to a single forum pursuant to 28 U.S.C. § 1407. On November 16, 1977, the Judicial Panel granted the Wells Fargo petition and transferred all then pending actions to this court for coordinated or consolidated discovery and pretrial purposes. *In re Armored Car Antitrust Litigation,* 441 F.Supp. 921 (Jud.Pan.Mult.Lit.1977). The instant litigation is the assembly of seventeen private treble damage actions either originally filed in or subsequently transferred to this district.[3] The Government's civil

---

1. The Government's civil enforcement action against Brink's and Wells Fargo is nearing settlement. A consent judgment has been proposed and is currently published for comment pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16.

2. Purolator Security, Inc. was named in the conspiracy but not indicted by the Atlanta Grand Jury. After investigations covering several cities and spanning three years, the Government filed an information accusing Purolator Security of antitrust violations in the city of Detroit with respect to certain custom-

ers for a ten-month period. This defendant tendered and the court, sitting in the Eastern District of Michigan, accepted a *nolo contendere* plea to the information.

3. The seventeen consolidated actions are: *Food Fair Stores, Inc., et al. v. Brink's, Inc., et al.,* C.A. No. 77–1246A; *Raley's Corp. v. Brink's, Inc., et al.,* C.A. No. 77–1273A; *L.D.C., Inc., et al. v. Brink's, Inc., et al.,* C.A. No. 77–1294A; *Biscayne Bank, et al. v. Brink's, Inc., et al.,* C.A. No. 77–1363A; *Liberty Coin Shop, Inc. v. Brink's Inc., et al.,* C.A. No. 77–1412A; *Illinois v. Brink's, Inc., et al.,* C.A. No. 77–1733A; *Wes-*

enforcement suit has proceeded at all times independent of the coordinated private actions. Sixteen of the seventeen private actions[4] now seek the court's approval of their settlement.

Immediately before the First Principal Pretrial Conference in this litigation, see Manual for Complex Litigation, Part 1, § 1.00 (rev. ed. 1977), the parties entered settlement negotiations. After approximately two months of negotiating and caucusing, a bargain was struck, with the defendants offering $11.8 million (representing contributions of $5,653,333 from Brink's, $2,346,667 from Wells Fargo, and $3,800,000 from Purolator Security) in exchange for civil peace for a ten-year period from the plaintiffs.

■■■ The court, on April 3, 1978, entered Settlement Order No. 1 which tentatively approved the settlors' proposal, conditionally certified the class of claimants, and formally authorized notification of the class. The conditional class for settlement[5] was defined as:

All plaintiffs and all purchasers from any armored car company (not limited to Brink's, Incorporated, Wells Fargo Armored Service Corporation or Purolator Security, Inc.) or its affiliates of armored car and related services, including coin sorting and wrapping, preparation and distribution of payrolls and air and ground courier services, from January 1, 1968 to February 21, 1978 (including banking institutions which have been furnished by others with armored car and said related services and which have legally recognizable claims against defendants based on the allegations and assertions in the consolidated actions which relate to alleged violations of Federal or State antitrust law in the provision of armored car or related services), excluding only the United States Government, its agencies, departments and instrumentalities, whether corporate or otherwise; the twelve Federal Reserve Banks, in-

---

ton L. Sampson, et al. v. Brink's Inc., et al., C.A. No. 77–1874A; Sunshine Stores, Inc., et al. v. Brink's, Inc., et al., C.A. No. 77–1875A; Philadelphia Electric Co. v. Brink's, Inc., et al., C.A. No. 77–1876A; Sunnydale Farms, Inc. v. Brink's, Inc., et al., C.A. No. 77–1877A; Connecticut v. Brink's, Inc., et al., C.A. No. 77–1878A; Massachusetts v. Brink's, Inc., et al., C.A. No. 77–1879A; Hillman's Inc., et al. v. Brink's, Inc., et al., C.A. No. 77–1880A; People's Gas, Light & Coke Co., et al. v. Brink's, Inc., et al., C.A. No. 77–1881A; Missouri v. Brink's, Inc., et al., C.A. No. 77–2020A; Brazosport Bank of Texas v. Brink's, Inc., et al., C.A. No. 78–422A; and Maryland v. Brink's, Inc., et al., C.A. No. 79–133A. For convenience, all filings and entries which concern all seventeen cases have been made in a master file, In re Armored Car Antitrust Litigation, C.A. No. 78–139A [All cases]. Pretrial Order No. 1, entered January 30, 1978.

4. Only Maryland v. Brink's, Inc., et al., C.A. No. 79–133A, has not joined in the motion to approve settlement. The State of Maryland previously sought to be excluded from the class of settling plaintiffs. Hillman's, et al. v. Brink's, Inc., et al., C.A. No. 77–1880A is proceeding to settlement but plaintiffs have retained their own counsel and are not represented by counsel for the class.

5. The court certified a conditional class pursuant to Rule 23(c)(1), Fed.R.Civ.P., for settlement. Settlement Order No. 1, entered April 3,

1978. The Manual for Complex Litigation, Part 1, § 1.46 (rev. ed. 1977), recognizes tentative certification of classes as a growing practice in complex actions but recommends that the practice not be continued. The Manual's recommendation has, it appears, been more honored by breach than by compliance. See City of Detroit v. Grinnell Corp., 495 F.2d 448, 466 (2d Cir. 1974) and cases cited therein. See also Developments in the Law—Class Actions, 89 Harv.L.Rev. 1318, 1555–60 (1976). The procedures set out in the Manual are not intractable rules but are suggestions for the orderly progress of complicated litigation. Manual for Complex Litigation, Foreword (rev. ed. 1977). The causes for not conditionally certifying a class for settlement (possibilities of collusion, of less than total representation of class members, of hasty and inadequate settlements by attorneys jockeying to earn a fee award) are not present herein. There have been no charges of collusion and no offers for settlement for less than the whole class, cf. In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106, n. 38 (7th Cir. 1979). (subclass tentatively certified for settlement). Class counsel worked jointly through lead counsel to secure the proposed settlement conditions and terms. Conditional certification of the class for settlement was appropriate under the circumstances presented.

cluding their branches; and the defendants, their affiliates, parents, and subsidiaries.

Although the settlement period runs from January 1, 1968 to February 21, 1978, the parties acknowledge a statute of limitations period from June 21, 1973 to August 31, 1975, absent a showing of fraudulent concealment (and no fraudulent concealment has been alleged).

On May 19, 1978, plaintiffs' representatives mailed 175,000 printed notices[6] and entered advertisements in eleven newspapers across the country, announcing the settlement proposal. The notices identified the named plaintiffs and defendants, recited the complaint allegations, defined the conditional class, and described the amount and terms of settlement.[7] The announcement scheduled a series of 4–6 week deadlines for filing: (i) requests for exclusion from the class, Rule 23(b)(3), Fed.R.Civ.P.; (ii) sworn statements of purchases, and (iii) notices of intention to appear and object at a hearing to review the settlement proposal. The court concluded in the April 1978 order that such notice was "the best notice practicable under the circumstances . . . " Rule 23(c)(2), Fed.R.Civ.P. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The noticed deadlines have now lapsed, the proponents and four objectors[8] have filed written memoranda, and the court has convened two hearings to determine the fairness, adequacy, and reasonableness of the settlement proposal.

The first hearing, on September 18, 1978, was adjourned upon a finding that the proponents' "attempted support of the settlement was patently insufficient." Order entered September 20, 1978, at 1. *See In re Armored Car Antitrust Litigation*, 462 F.Supp. 394, 395 (Jud.Pan.Mult.Lit.1978). The court cautioned that the settlement could not be approved without the tender of reliable economic data in justification of the proposal amount. *See* Manual for Complex Litigation, Part 1, § 1.46 (rev. ed. 1977).

Plaintiffs thereafter filed an economic supplement to their original memorandum. Included with the supplement were: Affidavit of Myer Rashish (plaintiffs' economic expert); Affidavit of David I. Shapiro (plaintiffs' counsel's account of the negotiations); Exhibit A—sample customer price histories of the three defendants; Exhibit B—sample customer contracts of three defendants; Exhibit C—affidavits of selected officers of the three defendants; Exhibit D—schedules of economic data tabulating or graphing defendants' revenues and profits on company-wide, local branch, and various competitive market bases; Exhibit E—

---

**6.** The notices were mailed to a list of potential class members. The master list was compiled from the defendants' records of customers, their suggestions of customers of competitors' services, their identification of the Governor, Secretary of State, and Attorney General of each of the fifty states, and from the plaintiffs' purchase from National Business Lists, Inc., mailing lists of: (a) banks, (b) savings and loan associations, (c) grocery stores with a net worth in excess of $75,000, (d) department and discount stores with a net worth in excess of $75,000, (e) city halls, (f) county seats, (g) stock and bond brokers, (h) universities and colleges, (i) junior colleges, and (j) school district headquarters.

**7.** The settlement amount of $11,800,000.00, deposited on April 3, 1978, bears interest at the prime rate. The fund reportedly totalled $12,931,991.65 on March 19, 1979. The notice stated that attorney fees and expenses and costs of administration of the fund, estimated not to exceed $1,750,000, would be subtracted from the settlement fund. The potential class members were notified that the settlement fund was offered in exchange for the dismissal with prejudice of all antitrust claims held against the three codefendants for the period January 1, 1968 to February 21, 1978. It further announced that the proportional shares of the claimants would be determined upon a plan of distribution to be presented to the claimants and court if the settlement proposal were approved.

**8.** The State of California, the Central Penn National Bank, and the Atlantic Richfield Company have filed objections to the settlement proposal and the joint petition for attorneys' fees. The State of Ohio (nominally joined by the State of Arizona) has filed objection to the attorneys' fee request.

The State of Missouri, a named settling plaintiff, apprised the court in timely fashion of its concern that the attorneys' fee position was excessive and noted belatedly its objection to the settlement.

report of federal and state regulation of the three defendants; Exhibit F—report of the changing geographic markets of the three defendants over the settlement period; and Exhibit G—balance sheets itemizing the net income and net worth of the three defendants. Defendant Purolator Security also filed a memorandum in support of approval of the settlement based on the economic data introduced in the affidavit of its president, William Steele, contained in Plaintiffs' Exhibit C. The State of California and the Atlantic Richfield Company, two of the four original objectors, renewed and amplified their opposition to the settlement proposal in light of plaintiffs' economic supplement.[9]

The objections to the settlement may be grouped as charges: that the agreement was hasty and premature; that the notice to class members was inadequate; that the class is improperly drawn; that the proposal lacks reliable economic support; and that the settlement fund amount is insufficient. These objections will be considered in our review of the fairness, adequacy, and reasonableness of the settlement. Additional categories of objections have been lodged against the form, content, and amount of the attorneys' fee petition. These latter challenges will be entertained in our separate review of the fee petition, *infra*.

Continuing the procedural history of this litigation, a second hearing on the proposed settlement was held on January 25, 1979. At the second hearing, exhibits of economic data and affidavits of economists, corporate officers, and lead counsel were proffered and admitted into evidence, expert testimony was elicited and cross-examined, and proponents' and objectors' arguments were heard. The primary matter of fairness, adequacy, and reasonableness of the settlement was taken under advisement upon announcement that the instant order, a final approval or disapproval of the settle-

ment, would issue after thorough review of all the evidence and argument.

## II. THE ARMORED CAR INDUSTRY

As a second predicate to our review, the settling parties have urged that a familiarity with the nature of the armored car industry will aid an appreciation of the settlement herein. At trial, plaintiffs would bear the burden of proving defendants' antitrust violations and the resultant injury which they suffered. Plaintiffs would also need to establish the difficult prerequisites of a class action, Rule 23, Fed.R.Civ.P., in order to proceed on behalf of the intended nationwide class. It is argued that these tasks become formidable indeed when the affected industry is the armored car trade because: a nonhomogeneous service rather than a fungible commodity is offered; a finely fragmented market is presented; and decentralized decision-making is common. Plaintiffs' Exhibit C: Affidavits of A. Schossow, Brink's general manager; T. Jordan, Wells Fargo assistant vice-president; and W. Steele, Purolator Security president. All of these characteristics so complicate the trade as to make proof of violation and impact through comparative price data arguably insurmountable.

The service offered by the defendants is tailored to fit individual customer needs. Customizing the service includes considerations of: the amount and type of valuable to be transported, the level of liability coverage to be assumed, the hour and frequency of pick-ups, and the need for additional assistance (such as, coin sorting and wrapping, check cashing, or safe rental and installation). See Plaintiff's Exhibits A and B (prices paid and contracts executed). As the terms of individual service vary, so too do the prices charged on each account. Comparisons of accounts and invoices therefore provide no meaningful measures of liability or damage.

---

**9.** The court might conclude that the State of Ohio's and the Central Penn National Bank's failure to renew their objections after the plaintiffs' submission of the economic supplement should be deemed an abandonment of their opposition. The court will not draw this con-

clusion but will consider Ohio's objection to the fee petition and Central Penn's objection to the notice, definition of the class, and attorneys' fees along with similar opposition raised by the State of California and the Atlantic Richfield Company.

Prices vary as a function of the constellation of services requested but they also vary to reflect the status and health of the defendants in a given market. Within a single market locale, the price charged different customers, and even the same customer owning several branches, may vary depending on the density and profitability of the defendants' service routes. If several customers line a single route, the fixed costs of labor, fuel, and vehicle use may be shared. But if a customer or a particular branch office is not convenient to an existing service route and a new route must be mapped, the fixed costs will be borne by the customer and the armored car company. Attempts at price comparisons within a single market then become useless gestures.

As the price charged varies within a given market, it also varies among markets. The local labor conditions or collective bargaining agreements may greatly affect prices charged from market to market. Brink's alone was signatory to 124 separate collective bargaining agreements in 1977. The geography and demography of a market may influence costs and pricing. State public service commissions, while not regulating armored car service prices, do regulate entry of providers into local markets and thus affect competition. Plaintiffs' Exhibit E. Finally, the autonomy of local service centers may account for further variations in pricing. In 1976 Brink's maintained 160 branch offices, Wells Fargo divided into 103 branches, and Purolator Security had 55 profit centers. The managers and sales representatives in these terminal centers held nearly free rein to negotiate customer contracts and to set service prices.

█ This catalogue of variables, all characteristic of the industry, arguably render usual price comparisons meaningless and tend to confound plaintiffs' prima facie proof of antitrust liability and impact. In light of the above-described progress in this litigation and mindful of the industry's idiosyncracies, the court may now begin the review of the proposed settlement.

## III. FAIRNESS, ADEQUACY, AND REASONABLENESS OF THE SETTLEMENT

Settlement agreements are "highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits." . . . In class actions this policy must be coupled with the two-fold requirement that (1) there is no fraud or collusion in arriving at the settlement and (2) the settlement is fair, adequate and reasonable . . . . *Miller v. Republic National Life Insurance Co.*, 559 F.2d 426, 428–29 (5th Cir. 1977). In a class action the court is charged as an overseer of the rights of unnamed passive members of the class and must therefore evaluate settlement proposals with circumspection. Rule 23(e), Fed.R.Civ.P. The facets of our circumspection may be enumerated as: (1) the circumstances of the settlement; (2) the complexity, expense, and possible duration of the litigation; (3) the present stage of the proceedings; (4) the risks of establishing liability; (5) the risks of proving damages; (6) the risks of maintaining the action as a class action through trial; (7) the range of reasonableness of the settlement fund relative to the best possible recovery; (8) the range of reasonableness of the settlement fund relative to the risks posed in this litigation; (9) the ability of the defendants to withstand a greater judgment; and (10) the reaction of the class to the settlement proposal. *Miller v. Republic National Life Insurance Co., supra; City of Detroit v. Grinnell Corp. ["Grinnell I"]*, 495 F.2d 448 (2d Cir. 1974). *See* Manual for Complex Litigation, Part 1, § 1.46 (rev. ed. 1977).

█ The proponents of the settlement, of course, bear the burden of proving that the proposal should be approved. *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). They should be put to a rigorous test but should not be required to stage a mini-trial on the merits, the event which settlement aims to preclude. *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir. 1972).

■ The court's review need not reach ultimate conclusions of fact and law in the underlying action, *Grinnell I,* 495 F.2d at 456, 462; rather, our task is one of balancing probabilities and likelihoods in an evaluation of the settlement proposal. *Young v. Katz,* 447 F.2d 431 (5th Cir. 1971). *See also Protective Committee v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). Similarly, we should be reluctant to interpose our business judgment for that of the settlors; rather, "[the] litigants should be encouraged to determine their respective rights between themselves." *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977). *See Florida Trailer & Equipment Co. v. Deal,* 284 F.2d 567, 571 (5th Cir. 1960). Mindful of these principles, the court's review of the proponents' and objectors' evidence and argument may proceed *seriatim* through the sometimes overlapping fairness criteria.

1. *Circumstances of the Settlement.* Our review under this first criterion investigates whether the settlement negotiations were conducted in an adversarial or collusive manner. No objector charges any fraud or collusion. Atlantic Richfield argues that the negotiations may have been hasty and premature, and California suggests that the plaintiffs' bargainers may have opened the negotiations lower than they should have. In essence, the objectors contend that a more favorable compromise might have otherwise been struck. Our evaluation of the settlement proposal is a measurement of fairness, adequacy, and reasonableness, not of optima. The court acknowledges the extensive experience of counsel for plaintiffs and defendants in antitrust litigation and must accede to their business judgment in this review. *Flinn v. FMC Corp.,* 528 F.2d 1169 (4th Cir. 1975).

The proponents of the settlement have detailed a chronology of proposals, bargaining, caucuses, and counter-proposals throughout the negotiations. Affidavit of David I. Shapiro. *See also* Plaintiffs' Exhibit C, Affidavit of William Steele, Pres. of Purolator Security. Plaintiffs argue that the timing of their settlement overtures just prior to the court's first pretrial conference was critical. It was speculated that the court at the preliminary conference would direct discovery on the limited issue of class certification and that plaintiffs' initial investigation [10] revealed that the strength of their bargaining position would diminish after such discovery. They thereupon contend that a deferral of the negotiations would have lessened the settlement prospects and amount.

Plaintiffs' opening offer, $19 million, approximated 5% of defendants' sales during the June 21, 1973 to August 31, 1975 statute of limitations period. Counsel had studied a correlation of settlement amount to percentage of sales in a number of similar antitrust cases and chose an ample starting figure which would allow room for later bargaining. When an agreement was finally executed, the settlement fund of $11.8 million represented 3.88% of defendants' sales for the limitations period and thus fell among the more generous recoveries counsel had studied.

While the proponents of the settlement have not persuaded nor even attempted to persuade the court in the preeminence or efficacy of any particular strategy, they have established the fact that the negotiations were conducted at arms length and in the best interests of the plaintiff class. The objectors' challenges have been investigated, *cf. In re General Motors Corp. Engine Interchange Litigation,* 594 F.2d 1106 (7th Cir. 1979) (abuse of discretion not to review conduct of and hear objections to the settlement negotiations), and have been answered.

2. *Complexity, expense, possible duration of the litigation:* The few objectors must concede that this multidistrict anti-

---

10. Before the settlement agreement was executed plaintiffs' counsel reviewed thousands of documents, those produced by defendants pursuant to Grand Jury subpoena and those produced in discovery in this litigation, in order to verify defendants' negotiation representations of the structure and economics of the industry and the nature of the violations charged. Counsel also interviewed their named plaintiff clients for a customer's view of these matters. Affidavit of D. Shapiro.

trust litigation will require complicated, expensive, and lengthy prosecution. If this litigation progressed to its full term, it would daresay outlive many of us. The costs of litigation might very well consume any final recovery, earning only a Pyrrhic victory for the survivors. If the litigation could not proceed on behalf of a nationwide class and was instead split into 50 statewide actions, or 500 market locale prosecutions, or 5–50,000 individual plaintiff lawsuits, the burden on the judiciary and the time taken from all others before the court would be enormous. *See Grinnell I,* 495 F.2d at 467. These factors all favor acceptance of the settlement proposal.

3. *Stage of the proceedings* : The litigation is in its infancy and the greatest savings of time and expense relative to full-term prosecution are now recoverable. However, as the objectors argue, this is also the time when the least is known about the prospects of full-term litigation. The objectors charge that the settlement was hastily entered into and was precipitously foisted upon the unwary class. They assail any settlement before an opportunity for formal discovery.

Plaintiffs' initial discovery attempts were stayed by our order entered October 13, 1977, pending a decision on transfer of the cases by the Judicial Panel for Multidistrict Litigation. They were also slowed in their investigation by the magistrate's sealing of the Bill of Particulars in the criminal ac-

tions. Once settlement was proposed and before an agreement was executed, teams of plaintiffs' counsel reviewed the mass of Grand Jury documents. Further, once we adjourned the first fairness hearing for want of supporting economic data, the parties engaged in extensive informal and cooperative discovery. The objectors are not satisfied but seek wider and more formal discovery.

■ We now have a compendium of documentary evidence and a selection of testimonial evidence upon which to evaluate the settlement. The fact that this material was produced informally and cooperatively is not a failing but is a recommendation for the settlement. *See Cotton v. Hinton,* 559 F.2d 1326, 1332 (5th Cir. 1977).[11] This material, under protective seal upon defendants' motion, *see* Order entered October 20, 1978, has been made accessible and available to the objectors. The fact that this material was compiled informally or cooperatively does not alter its reliability or thoroughness. Although these antitrust actions are in their infancy, "the desired quantum of information necessary to achieve a settlement. . . ." *Cotton v. Hinton,* 559 F.2d at 1332, has been reached. Because this stage of the litigation affords the greatest returns and yet, under the circumstances, does not compromise the necessary amount of supportive data, settlement appears to be favored.

11. The court is reminded of similar circumstances raised in this appellate review of a trial court's approval of the settlement of an employment discrimination action:

> It is true that very little *formal* discovery was conducted and that there is no voluminous record in the case. However, the lack of such does not compel the conclusion that insufficient discovery was conducted.

> At the outset, we consider this an appropriate occasion to express our concern over the common belief held by many litigators that a great amount of formal discovery must be conducted in every case. Often has this Court reviewed records of cases which attest to this commonly held fallacy. We have often seen cases which were "over discovered." In addition to wasting the time of this Court, the parties and their attorneys, it often adds unnecessarily to the financial burden of litigation and may often serve as a vehicle to

harass a party. Discovery in its most efficient utilization should be totally extra-judicial. The Court should rarely be required to intervene. Being an extra-judicial process, informality in the discovery of information is desired. It is too often forgotten that a conference with or telephone call to opposing counsel may often achieve the results sought by formal discovery.

> In the instant case, Judge Pointer specifically requested the plaintiffs and defendants to conduct discovery on an informal basis. Counsel proceeded to do just that. The attorneys for plaintiffs and defendants indicated to the trial judge that they had achieved the desired quantum of information necessary to achieve a settlement. The Court was informed of the results of their discovery in several conferences.

*Cotton v. Hinton,* 559 F.2d at 1332.

*4. Risks of establishing liability*: The strength or weakness of plaintiffs' case is of course crucial to a determination of adequacy of a settlement. *Protective Committee v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). Assaying the strength of the claims requires a consideration of the required proof in a treble damage action. While proof under Section 1 of the Sherman Act, 15 U.S.C. § 1, requires only proof of a violation of the Act, civil recovery under Section 4 of the Clayton Act, 15 U.S.C. § 15, demands 2-part proof of liability and damages. To establish liability under Section 4, the civil plaintiff must prove: (1) a violation and (2) an impact on plaintiff. *State of Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 317 (5th Cir. 1978). The "impact", sometimes referred to as the "fact of damage" or "causal link", *id.*, has been declared "the *sine qua non* for stating a cause of action." *Shumate & Co. v. National Association of Securities Dealers, Inc.*, 509 F.2d 147, 152 (5th Cir. 1975). Plaintiffs contend that while proof of a violation by a nationwide conspiracy would be difficult, proof of nationwide impact would be nearly impossible. California, as an objector, responds contending that plaintiffs protest too much and that from local, limited investigation violation and impact are readily apparent.

At the outset the court notes that plaintiffs herein are not armed with prima facie proof of defendants' violation of the federal antitrust laws. A similar circumstance was presented in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Corp.*, 382 F.Supp. 999 (E.D.Pa.1974), *vacated and remanded*, 540 F.2d 102 (3d Cir. 1976):

> Thus, this was not a case where plaintiffs received from the government on a silver platter the evidence necessary to prove their claims against the three convicted defendants, much less against the thirteen which had entered pleas of *nolo contendere*. Substantial problems of proof were present as to both liability and damages.

382 F.Supp. at 1016. Brinks and Wells Fargo pleaded *nolo contendere* to conspiracy charges of market allocation and bid-rigging from 1968 through 1975. These charges were echoed in plaintiffs' civil complaints. Purolator Security pled *nolo contendere* to similar charges but limited to a conspiracy in the city of Detroit for a 10-month period, 1974–75. The *nolo contendere* pleas, unlike guilty pleas or verdicts, are not accorded the status of prima facie evidence of a violation in subsequent civil actions, 15 U.S.C. § 16(a). *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp. ["Lindy I"]*, 487 F.2d 161 (3d Cir. 1973). Lacking this automatic proof, plaintiffs would have to adduce their own evidence to build proof of a Sherman Act violation. Plaintiffs do not contend that the proof of a pervasive conspiracy would be impossible, merely difficult, in light of the fragmented market and discontinuous violations, and thus a risk of litigation which would have to be countenanced. Defendant Purolator Security argues that proof of a violation would be impossible. *Cf. Liebman v. J. W. Petersen Coal & Oil Co.*, 73 F.R.D. 531, 535 (N.D.Ill.1973) (prima facie case readily established and probability of liability was substantial). The court need delve no further into this first part of the liability proof than to ascertain that some risk is involved, as the second part of plaintiffs' proof, by all appearances, would be decidedly difficult.

Plaintiffs must establish in the second part of their liability proof that defendants' violation of the Sherman Act caused them harm. In a casebook instance of price-fixing involving a fungible product peddled in the same or similar markets to standardized categories of consumers, the proof of impact can nearly be presumed from the overcharge. *See e.g., In re Sugar Industry Antitrust Litigation*, 73 F.R.D. 322 (E.D.Pa.1976). Here, however, the charges are of market allocation and bid-rigging in the sale of a service in variant markets to nonhomogeneous buyers. The circumstances created by the very nature of the industry do not lend themselves to a generalized proof; rather, regional or individual evidence of impact might ultimately be required. *See State of Alabama v. Blue Bird Body Co.*, 573 F.2d at 322 (5th Cir. 1978);

*Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977) (class certification to be denied upon a finding that neither the products nor the purchasers were fungible). California, as an objector, points to the apparent uniformity of bids and prices submitted to its political subdivisions and predicts that similar patterns may emerge in other markets. The court has previously ruled that the conspiracy causing artificially inflated prices in California appears to be a different conspiracy from the one here in issue as it allegedly involves only codefendant Brink's acting in concert with other armored car services not parties to this litigation. Order entered December 4, 1978.[12] Therefore, plaintiffs' proof of liability may not be impossible, as defendants would boast, but it is, upon our review, uncertain.

5. *Risk of establishing damages* : If, as we have found, plaintiffs face a substantial risk in proving defendants' liability, that is, in demonstrating "violation" and "impact," they then must also admit to an uncertainty in establishing damages. This uncertainty results from the apparently sporadic conduct of the alleged conspiracy and from the idiosyncracies of the armored car industry itself. The wages of the conspiracy may have ebbed and flowed with the entry or exit of other competitors in a particular market area. *See* Plaintiffs' Exhibit F (Defendants' market expansion and contraction during the pertinent period). Prices of armored car services, *see* Part II, *infra*, are functions of multiple variables rendering market-to-market and even customer-to-customer comparisons meaningless. Establishing damages might therefore require difficult temporal and individualized proof of injury. While damages need not be established with precision, they may not be merely speculated. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946). The risk and expense in establishing damages must therefore also be countenanced in evaluation of the settlement.

6. *Risks of maintaining action as a class action* : The questions of whether plaintiffs could have certified a nationwide class of customers and, if so, whether such certification could have survived the litigation are not easily answered. Assuming plaintiffs could satisfy the requirements of numerosity, commonality, typicality, and representativeness of Rule 23(a), they would still face the rigorous test of demonstrating the predominance of common questions of law and fact in the action and the superiority of proceeding as a class rather than individually in the action, Rule 23(b)(3), Fed.R.Civ.P. The predominance of issues and the manageability of the action must be determined upon an application of relevant law to the unique circumstances presented in any action. In private antitrust actions charging price fixing in the trade of a fungible product, *see e. g., In re Sugar Antitrust Litigation*, 73 F.R.D. 322 (E.D.Pa.1976), the superiority and manageability of the action as a class action may be more readily apparent. But in antitrust actions charging other violations, or involving nonfungible products, or concerning disparate consumers, the fitness of a class action becomes less certain. For example, in *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977) (en banc), the trial court's refusal to certify a class was held not abusive of discretion when it appeared that sales of various grades of tobacco at several markets over four marketing seasons would require minitrials or individualized proof of impact and

**12.** The court notes that a federal grand jury sitting in the Central District of California has recently returned criminal indictments: (1) charging Armored Transport, Inc. and two of its corporate officers with engaging in a conspiracy to allocate customers and to rig bids and price quotations; and (2) charging Loomis Armored Car Service, Inc. with engaging in an unlawful combination to subimit rigged and collusive bids and price quotations. These conspiracies are alleged to have restrained trade in the armored car industry in the State of California and the Los Angeles area, respectively. Brink's, Inc. is named, but not charged in both indictments. California's Further Authority in Opposition to the Class Settlement, filed March 15, 1979. These indictments lend support to our determination that California may have been injured as a result of an unrelated conspiracy. California should be free to pursue any antitrust claims it holds against Armored Transport and Loomis.

damage. *See also Chestnut Fleet Rentals, Inc. v. Hertz Corp.*, 72 F.R.D. 541 (E.D.Pa. 1976) (class certification denied as "fact of damage" would have to be established on an airport-by-airport basis); *In re Transit Co. Antitrust Litigation*, 67 F.R.D. 59 (W.D. Mo.1975) (class certification denied as five defendants and 1400 leasing agreements were involved). Yet in *In re Master Key Antitrust Litigation*, 70 F.R.D. 23 (D.Conn.), *appeal dismissed*, 528 F.2d 5 (2d Cir. 1975), the sale of building lock and key hardware to numerous government entities in variant markets did not pretermit class certification as generalized impact and injury could be presumed from the alleged overcharges. *See also Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34 (S.D.N.Y. 1977) (class certification granted in an antitrust action charging market allocation and bid-rigging of building maintenance services when court noted a fungibility of the providers, if not of the services, and a possibility of formulary damages). *See generally Developments in the Law—Class Actions*, 89 Harv.L.Rev. 1318, 1362–65 (1976).

Plaintiffs would attempt to draw analogies from the latter line of cases and to disassociate themselves from the former. This admittedly difficult task has recently been greatly encumbered. After the proposed settlement agreement had been executed and the court's first settlement order had issued, the Fifth Circuit reversed a trial court's certification of a class in a contagiously similar private antitrust action, *Alabama v. Blue Bird Body Co.*, 573 F.2d 309 (5th Cir. 1978). The plaintiffs in *Blue Bird* charged the defendants with violative price fixing and market allocation in the school bus manufacturing industry. The trial court had certified a nationwide and a statewide class of claimants. The appellate court reversed the nationwide certification and remanded the case, opining that the lack of any nationwide impact evidence precluded prosecution on such basis. In strikingly apt terms, the court described the peculiarities of the case and the affected industry:

> [T]his particular litigation might not fit into the category of a "classic" antitrust price-fixing conspiracy where all legal and factual issues relating to the conspiracy are uniformly related to all those allegedly harmed. Rather, in this case neither the products involved nor the purchasers appear to be standardized. The plaintiffs' class includes different sizes of governmental buyers, operating under different conditions throughout the United States, and the products involved, while commonly known as school bus bodies, apparently differ in many respects and have been marketed under various arrangements at different times. [footnote omitted]

573 F.2d at 322. *In re Armored Car Litigation* shares many of the peculiar attributes cited in *Blue Bird*. *See* Plaintiffs' Exhibits B (sample contracts), C (affidavits of defendants' officers), and D (schedules of defendants' revenues and profits). The plaintiffs would, of course, seek to distinguish the facts and holding in *Blue Bird* from the circumstances presented herein. They would argue that a nationwide conspiracy was practiced in the armored car industry and that its impact although sporadic and uneven was felt in all markets. The proof would be difficult, if not impossible as defendants portend.

The objectors have argued that if maintenance of the action as a class action would be so problematic then perhaps it should proceed in subclasses or separate individual actions. Perhaps this would, in fact, be the result if the litigation proceeded and did not stop short at settlement. But at this moment and upon all the arguments and facts presented, the court perceives no individual injustice if the action is settled on the basis of the nationwide class which was conditionally certified, Settlement Order No. 1, entered April 3, 1978. California as an objector claiming substantial injury had maintained that its recovery would be unfairly diminished by a forced sharing of the fund with less seriously injured class members. The court, however, has already found that the special plight of the State of California was more probably caused by an unrelated West Coast conspiracy. Order entered December 4, 1978, at 3. California's claims under such a conspiracy may

not be compromised by the settlement herein. *Id. See Zenith v. Hazeltine Research, Inc.*, 401 U.S. 321, 342–48, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Upon all the foregoing considerations, it appears that plaintiffs' risks of maintaining the action as a class action throughout the litigation would be great and that settlement at this time would be opportune.

■ 7. *Range of reasonableness of the settlement fund in light of the best possible recovery*: In order to assess the adequacy of a particular settlement fund, the court needs some idea of the relative bounds, first, of best possible recovery and, second, of probable recovery with regard to the risks inherent in the litigation. Measuring these bounds does not imply that they set the limits of permissible recovery in settlement.

The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved. *Grinnell I*, 495 F.2d at 455. *See Harry Lewis v. Great American Mortgage Investors, et al.*, C.A. No. 75–591 and *W. R. Morgan, et al. v. Great American Mortgage Investors, et al.*, C.A. No. 75–769 (N.D.Ga. May 11, 1978) (Freeman, J.) (approving class action settlement paying 1% of claims); *Helfand v. New America Fund, Inc.*, 64 F.R.D. 86 (E.D.Pa.1974) (approving class action settlement granting payment of 5% of claims); *In re Four Seasons Securities Laws Litigation*, 58 F.R.D. 19 (W.D. Okla.1972) (approving class action settlement affording approximately 8% recovery on claims); *Sunrise Toyota v. Toyota Motor Co.*, [1973–1] Trade Cases (CCH) ¶ 74,398, at 93,821 (S.D.N.Y.1973) (approving class action settlement authorizing no damage award). Instead, these estimated ranges of possible recovery merely serve as reference points in the court's evaluation of the presented settlement offer.

The court requires reliable economic data in order to assay the fairness, adequacy, and reasonableness of the settlement proposal. No single formula of damage calculation is prescribed or possible in antitrust actions. What is necessary is " 'a just and reasonable estimate of the damage[s] based on relevant data.' " *Hobart Brothers Co. v. Malcolm T. Gilland, Inc.*, 471 F.2d 894, 902 (5th Cir. 1973) *quoting from Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946). "The essential thing is that the plaintiff develop a theory about how the amount of injury can be measured and introduce the data necessary to make the estimate." L. Sullivan, *Handbook of the Law of Antitrust* 786 (1977).

Plaintiffs have now supplied and introduced into evidence reams of economic data; their economic expert has analyzed the data and has projected an estimate of damages. Plaintiffs postulate a range of $8,523,032 to $16,741,670 (with an average of $11,871,366) in damages for the statute of limitations period, June 21, 1973–August 31, 1975. The settlement fund of $11,800,000 falls comfortably within this projected possible damage range. The Atlantic Richfield Company, a class member, has indirectly objected to plaintiffs' damage projection by complaining that it is not grounded upon any "formal" discovery. The State of California objects: (i) to the use of profits rather than prices as a basis for plaintiffs' estimate of damages; (ii) to the methodology of the profit analysis; and (iii) to the computation employed in this analysis. Plaintiffs' estimates and the objectors' challenges have been thoroughly considered by the court; the estimates have been deemed reliable and the challenges have been found wanting. A brief overview of plaintiffs' derivation of the ranges of possible damage and of their answers to the objectors' charges, however, is warranted in this final order.

■ The plaintiffs' economic expert, Myer Rashish, perused sample contracts, Plaintiffs' Exhibit A, and purportedly representative price histories, Plaintiffs' Exhibit B, of defendants' customers. These contracts had been selected at random from categories of defendants' customers, the categories assigned by the size of the account, Plaintiffs' Exhibit C. Mr. Rashish concluded and the objectors concede that

this "price data" is meaningless and unuseable. Because of the very nature of the industry, a sale of an individualized service subject to local negotiations under variable market conditions, see Part II, supra, a classic comparison of conspiracy and non-conspiracy prices to estimate damages was not practicable in plaintiffs' expert's opinion.[13] The plaintiffs thereupon sought to determine whether an estimate of damages could be projected from a different base of information. Although plaintiffs conceded that price comparisons would be necessary in a proof of damages at trial, they theorized that some other analysis might provide the requisite range of damage estimates for settlement approval. Profit information was readily available and upon initial and continued examination, plaintiffs postulated that profit data could serve as the surrogate for the lacking price information. This hypothesis of a close but not exact relationship of profit and price assumes that anticompetitive conspiracies are entered into and maintained for the purpose of turning greater profits and that the increase in profits roughly reflects the injury suffered by a class of customers. The court finds the hypothesis sound and the assumption trustworthy in formulating an estimate of damages for review of a settlement proposal.

■ California objects and adamantly argues that only prices may form the basis for an estimate of damages. California unrealistically adheres to this objection in the face of insupportable odds. Meaningful price data have simply been unavailable in this industry. The objector proposes that the search for the data has been incomplete and suggests that a proper analysis might require collection and tabulation of price histories of every customer in every village, hamlet, and town. Testimony of Robert Springer, January 25, 1979, hearing, Tr. at 57. The objector predicts, however, that a thorough compilation of this data in a few cities may produce statistics that would suggest a pattern of price increase which could be extrapolated to other cities. But even a detailed collection of price histories for some cities would be a monumental and costly undertaking. It can only be assumed that a substantial portion, if not all, of the settlement fund would be consumed in such an effort. Common sense demands that a reliable substitute, if available as herein, must be pursued to ensure protection of the class of claimants. California's theoretical dissatisfaction with a profit study to estimate damages must be quelled in the best interests of the class. California's motion to reopen discovery on the issue of damages must accordingly be DENIED.

Proceeding then to a review of the profit study, plaintiffs' economist sought in four separate analyses to compare the during and post-conspiracy profit margins.[14] In his four approaches, he sought to isolate that portion of the profit margin differential which could be attributed to the conspiracy rather than to unrelated variables. Plaintiffs' expert does not pretend that these analyses are precise but instead suggests that they will produce a reliable range of possible damages, the reliability commensurate with the roughness of the available data.

California, upon its own expert's review of the plaintiffs' four approaches, objects again to the use of profits rather than prices as a base, and also to the methodology and computation of plaintiffs' analyses.

13. Damages conventionally would be estimated by internal comparisons of the conspirators' prices during and after the conspiracy or by external comparisons of the conspirators' prices with those of a nonconspiring competitor or in an unaffected market, see e.g., City of New York v. Darling-Delaware, Inc., 1976 Trade Cases (CCH) ¶ 60,812 (S.D.N.Y.1976). Upon a review of the data compiled by defendants from random accounts and price histories, the plaintiffs' expert concluded that a classic study and projection of damages could not be done. The traditional internal and external comparisons were not possible and prices, the currency of comparisons, were not available in the instant litigation.

14. Plaintiffs' expert expressed the comparison of during and post conspiracy profits as a differential in profit margins, i. e., the percentage profit margin during the conspiracy minus the percentage profit margin after the conspiracy. These differentials were adjusted to isolate the effect of the conspiracy from other known market and economic variables.

The objector urges that profits will underestimate damages in a conspiracy because the costs of policing the conspiracy will deflate profits and because noncompetitive trading is a "narcotic" to efficiency and profit-making, *see United States v. Aluminum Co.*, 148 F.2d 416, 427 (2d Cir. 1945). California's expert has opined that with these alleged errors damages may be twice (Objector's Response to the Economic Supplement, at 15), four times (Objector's Response to Plaintiffs' Reply, at 2), or even ten times (January 25, 1979 Hearing, Testimony of R. Springer, at Tr. 51) the $11.8 million reached by plaintiffs' analyses.

California asked the Court to appoint its own expert to review the analyses and criticisms. The Manual for Complex Litigation, Part 1, § 3.40 (rev.ed.1977), specifically allows court appointment of an expert when:

> the parties' experts have offered conflicting or irreconcilable opinions or when any well-recognized school of thought is not represented in the opinions proposed to be offered or when a court-appointed expert would facilitate understanding of the technical issues involved or under circumstances in which a court-appointed expert might be necessary or desirable.

*See also* Rule 706, Fed.R.Evid. The *Manual* suggests that although appointment of a court's expert should be "the exception rather than the rule . . . .," the appointment exception may lie when the parties' experts disagree on the theory, as opposed to the factual basis, for their opinions. This exception, it is argued, is presented in the dispute at hand because while California may object to alleged errors of plaintiffs' profits analysis, it primarily assails plaintiffs' choice of profits as a measure to assay the settlement fund. The plaintiffs challenged California's request as unprecedented, Plaintiffs' Reply, at 4; defendant Purolator Security opposed the request as unnecessarily delaying, Purolator Memorandum, at 32.

The court concludes that a court-appointed expert will not be necessary or desirable in this instance. Although California has attempted to obscure simple calculations with clouds of algebra, our task is clear and is not complex. The court at this juncture need only be assured by reliable economic data that the settlement proposal is fair, adequate, and reasonable. The court has already rejected California's challenge to the use of price comparisons. The proponents need only supply an educated estimate of damage ranges. We are convinced that has been done and will not authorize decimation of the settlement fund in order to pinpoint the claimed injury. The objector's challenges to the method and calculation, *see infra*, are found similarly wanting. A court-appointed expert would not be helpful under these circumstances. California's request should therefore be DENIED.

The challenged approaches of plaintiffs' expert, Myer Rashish, may be briefly reviewed. In his study of profits, Mr. Rashish performed four different analyses of the profit data, Plaintifs' Exhibit D, with each analysis stated in terms of a profit differential comparing conspiracy and post-conspiracy profits. Assuming, but not accepting, profits as the currency of the study, the objector has proceeded to challenge each of the four phases of plaintiffs' expert's analysis as both invalid in theory and flawed in execution.

Rashish Analysis # 1—

An examination of the average profit margins of the three defendants in the fifty largest cities in the United States during the 1968–75 conspiracy years was compared with the similar average for the 1976–77 post-conspiracy years. The examiner noted a marked decline in the profit margin in the post-conspiracy years. The differential, expressed as a percentage of sales, was approximately 3.0, unweighted, and 6.0, weighted. "Weighting" considers each profit margin in light of the volume of business done by each conspirator in each of the fifty cities, that is, it determines whether the market was shared equally ($\frac{1}{3}$, $\frac{1}{3}$, $\frac{1}{3}$) or unequally by the three codefendants and then "weights" the profit according to the market share. The examiner selected the midpoint, 4.5, between the unweighted 3.0 and weighted 6.0 (not knowing which more

accurately reflected the profit differential in this industry) and multiplied 4.5 times $304,394,000, defendants' total sales to class members for the two year statute of limitations period June 21, 1973—August 31, 1975. The conclusion drawn from this approach estimates damages between $9,131,820 and $18,263,640, or at an average of $13,697,730. California challenges this result contending that only the 6.0% weighted profit differential has meaning and that the unweighted figure will tend to understate damages. California, using this 6% figure, estimates that damages for the statute of limitations period should be approximately $18,000,000.

Rashish Analysis # 2—

The overall profits of the three defendants in the conspiracy and post-conspiracy years were studied, making an adjustment for any profit trend attributable to other variables, such as a predictable profit decline associated with a generally faltering national economy. The examiner identified a general downward trend in profits in 1972–75 during the conspiracy. He expressed this trend as an average decline for the years, −1.2%, and then projected this trend line for two years beyond the conspiracy, giving an expected profit margin of 8.9% in the non-conspiracy years. The actual average profit margin for the non-conspiracy years was 6.1%. Thus a differential of 2.8% of sales might hypothetically represent profits due to the conspiracy alone. This differential was translated into an estimate of damages of $8,523,032 for the statutory period.

California complained that the data have been unfairly manipulated to leave out the peak year 1971. Using this year, the objector arrived at a differential of 4.9% and damages of $14,920,000. Mr. Rashish replied that he was not unjustly manipulating the figures but was instead attempting to spot trends. He reran his analysis using an average profit margin decline derived from a study of all the conspiracy years, 1968–75, and arrived at a differential of 2.7% or damages of $8,228,638 for the limitations period.

Rashish Analysis # 3—

A comparison was made between the armored car industry and the trucking industry, a close but not perfect analogy, to determine damages during the conspiracy period. To account for the differences in the industries, a comparison was first drawn between the average trucking profit margins, 5.0%, and the defendants' average profits in the post-conspiracy years, 7.5%, revealing a 2.5% profits margin difference between the two industries. The expert then examined the average defendants' profit margin for the conspiracy years, 13.0%, subtracted the trucking industry profit margin, 5.0%, and adjusted this figure by the 2.5% difference attributable to industry differences (i. e., (13%–5.0%)—2.5%) to arrive at 5.5% as a statement of defendants' ill-gotten gains during the conspiracy years. This percentage equalled an estimated $16,741,670 in damages for the fourteen-month period.

California challenged the choice of the trucking industry, a highly regulated business, as an analog for a comparative analysis. Further, the objector noted that the benefits of the conspiracy were not completely purged in the post-conspiracy years. Because all effects were not purged, these years would not provide a perfect competitive norm, and therefore use of profit margin differences for these years would arguably tend to understate damages. California suggested that the best use of a bad analog would be an unadjusted comparison of defendants' armored car conspiracy profits, 13%, and trucking industry profits, 5%. This comparison resulted in an 8% profit margin differential and yielded estimated aggregate damages of $24,350,000.

Rashish Analysis # 4—

A comparison was studied of conspiracy and post-conspiracy profit margins in markets in which defendants competed with each other and in markets where they did not. Such an analysis predicts that the profit margin differential will be greater in those categories of markets where more than one defendant did business because it

was in those markets where they could conspire to allocate routes and customers or to rig bids. Comparing the during and post-conspiracy profit margin differentials for the two categories of markets in which more than one defendant did business resulted in an average differential of 4.5% or estimated damages of $13,697,730.

California challenged the meaning of this comparison, contending that weighted and unweighted data had been carelessly mixed. California made no estimate of damages of its own under this approach. Mr. Rashish replied, showing that only weighted averages were used, and then performed an additional calculation comparing profit margin differentials in markets with other defendants with those from markets with no competition from a codefendant. This calculation was an attempt to adjust the previous result for variables attributable to something other than the conspiracy. Comparing these sets of market categories resulted in a new identification of the profit margin due to the conspiracy, 2.9%, or an estimated $8,827,427 in damages for the statute of limitations period.

A tabular summary of the estimated damages for the statute of limitations period, using the four Rashish approaches, reveals:

| | California's estimate | Plaintiff's estimate |
|---|---|---|
| Rashish Analysis #1 | $18,000,000 | $13,697,730 |
| Rashish Analysis #2 | $14,920,000 | $ 8,523,032 |
| Rashish Analysis #3 | $24,350,000 | $16,741,670 |
| Rashish Analysis #4 | Unknown | $13,697,730 and recalculated at $ 8,827,427 |

Plaintiffs' average estimated best possible recovery for the statute of limitations period equals approximately $13.7 million or approximately $11.8 million when Rashish Analysis #4 is recalculated. The objector's range of estimates runs from $15 to $24 million. The settlement fund of the proposal is set at $11.8 million plus interest. If the plaintiffs' attempt to produce a reliable economic estimate of best possible recovery were accepted, the settlement proposal amount would fall comfortably within considerations of fairness, adequacy, and reasonableness.

The court concludes that plaintiffs have finally supplied reliable economic data justifying the settlement amount. We state no opinion as to whether these are the best available data and the most reliable analyses, only that they are acceptable and rational means of estimating damages under the circumstances presented. On the basis that these estimates of the optimum recovery coincide with the proposal offer, settlement of the litigation is clearly favored.

8. *Range of reasonableness of the settlement fund in light of the risks posed in litigation* : If the settlement fund falls comfortably within a range of estimates of the best possible recovery, it must *a fortiori* fall within or beyond the bounds of likely recovery under the circumstances of the litigation. In a review of a settlement proposal "[t]he most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." *West Virginia v. Charles Pfizer & Co.,* 440 F.2d 1079, 1085 (2d Cir. 1971). *See Protective Committee v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *Young v. Katz,* 447 F.2d 431, 434 (5th Cir. 1971); *Florida Trailer & Equipment Co. v. Deal,* 284 F.2d 567, 571 (5th Cir. 1960). We have previously determined that the risks of prosecuting this action, if not insurmountable, are at least severe. The estimates of likely recovery would therefore be mere fractions of the $8–16 million range of best possible recovery. If all of California's doomsaying were realized, that is, that plaintiffs' estimates understate damages two, four, or even ten-fold, the settlement fund of $11.8 million would still appear more than ample in the face of these substantial risks. The court again reminds that the test is of fairness, adequacy, and reasonableness of an amount offered today in the early stages of litigation, and that:

> there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.

*Grinnell I*, 495 F.2d at 455 n.2. Under such scrutiny, the settlement offer is certainly sufficient.

9. *The ability of the defendants to withstand a greater judgment* : The Second Circuit in *Grinnell I* explained the importance and underpinnings of this consideration.

Appellants have cited no authority for the proposition that the defendants' ability to pay is an improper consideration when approving a settlement offer. Likewise, we are unable to find any such authority. Common sense seems to dictate the necessity, to say nothing of the propriety, of such a consideration. In fact, all available authority defies appellants' analysis. According to the United States Supreme Court: "Further, the judge should form an educated estimate of the complexity, expense and likely duration of such litigation, *the possible difficulties of collecting on any judgment which might be obtained,* and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Protective Committee v. Anderson, supra*, 390 U.S. at 424–25, 88 S.Ct. at 1163.

495 F.2d at 467 (emphasis in original). A settlement amount which would plunge the defendants into immediate bankruptcy would not serve the best interests of the class of claimants.[15] Although a defendant should be compelled to disgorge his ill-gotten gains for violation of the federal antitrust laws, *see Liebman v. J. W. Petersen Coal & Oil Co.*, 73 F.R.D. at 536, this mandate becomes less forceful when questions of violation and gain go unanswered. The court then looks to the defendants' ability to pay in weighing the strengths of the case and the potential bounds of injury.

An officer of defendant Brink's testified that the Brink's contribution to the settlement fund and the criminal fines previously imposed approximate its 1977 corporate earnings and equal one and one-half years' shareholders' dividends. Plaintiffs' Exhibit G, Affidavit of A. Tolan. The Wells Fargo contribution exceeds its 1977 net operating income. Plaintiffs' Exhibit G. Purolator Security's president declares that its share in the fund together with the costs of satisfying the civil and criminal charges greatly exceeds the company's net profit for 1975, 1976, and 1977 combined. *Id.*, Affidavit of W. Steele. The codefendants' balance sheets, Plaintiffs' Exhibit G, affirm these declarations and suggest that the fund approaches the limit of their ability to pay.

10. *Reaction of the class to the settlement proposal* : A report and supplemental report on the interim administration of the proposed settlement relate that in response to the approximately 175,000 notices of settlement and to the ten national newspaper announcements, a total of 7,952 claims and 213 requests for exclusion from the class have been filed. Of the four objections originally lodged against the settlement, one, the objection of the State of Ohio, challenged only the attorneys' fee petition, and another, that of the Central Penn National Bank, was not renewed after the plaintiffs' submission of their economic supplement to their original memorandum in support of the settlement. Upon these reports, 99.975% of the class of claimants may be viewed as supporting the settlement and thereby favoring the court's approval of the proposal. *Cf. Cotton v. Hinton*, 559 F.2d at 1331 (settlement proposal approved although more than half of the class appeared to object to the proposal).

The court, however, must be reluctant to place undue reliance on the claimants' apparent acquiescence. In some cases, class acquiescence may be explained either as the individual members' unwillingness to expend the time and money necessary to file and pursue objections or as a failure of the settlement notice adequately to describe the terms and conditions of the proposal. The court finds that these explanations should not be presumed herein and that silence should be deemed consent.

---

15. If defendants were thrust into bankruptcy, plaintiffs would likely recover only a small part of their claimed damages when defendants' assets were apportioned among an array of scheduled creditors. Also if defendants, three of the largest suppliers in the trade, were forced out of business, the cost of armored car services predictably would climb. Either result would disserve the interests of the class of claimants.

The members of the instant class, customers of armored car services, are predominately governmental subdivisions or large private corporations, such as banks, department stores, and grocery store chains. They are not private individuals, such as hotel guests or automobile or fuel purchasers. *Compare State of West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710 (S.D.N.Y.1970), *aff'd*, 440 F.2d 1079 (2d Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971) (class composed of public and private institutions which purchased antibiotics) *with In re Hotel Charges*, 500 F.2d 86 (9th Cir. 1974) (class composed of hotel guests improperly surcharged for telephone calls); *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d at 1106 (class claimants were individual car purchasers); *and Liebman v. J. W. Petersen Coal & Oil Co.*, 63 F.R.D. 684 (N.D.Ill.1974) (class members were individual purchasers of coal in the Chicago area). The instant plaintiff class members are expected to be capable of marshalling the resources necessary for an objection.[16] Failure to interpose objections may then be read as affirmance of the settlement proposal.

The court has already concluded that the notice published in this litigation was appropriate and adequate. Settlement Order No. 1, entered April 3, 1978, at 5. The notice described the foundations of the litigation, detailed the terms of settlement, and set the deadlines for claims and opt-outs. The timetable established in the notice (4–6 weeks for responses) was not inconsistent with the deadlines governing similar litigation. *See e.g., Miller v. Re-public National Life Insurance Co.*, 559 F.2d at 429 (4 weeks); *Grunin v. International House of Pancakes*, 513 F.2d at 121 (19 days); *United Founders Life Insurance Co. v. Consumers National Life Insurance Co.*, 447 F.2d 647, 652 (7th Cir. 1971) (25 days). The notice could have been more thorough and could have suggested an estimated range of damages and recovery; the settlement proposal could have been stalled, allowing more time for discovery. These possible faults are not fatal; the notice was adequate. The court therefore concludes that the class has tacitly but solidly affirmed the settlement proposal.

In similar manner the court finds that the conditional certification of a class of claimants for settlement purposes may now be granted final certification. The class is not unduly restrictive, *cf. In re General Motors Engine Interchange Litigation*, 594 F.2d at 1106 (certification of only a subclass of claimants for settlement purposes), but includes all customers of armored car companies except the Federal Reserve Banks. The class is not overly broad, as the allegation of a nationwide conspiracy has been reasonably posited. Although the effects of the conspiracy might have been felt intermittently in various markets, the fact of a nationwide conspiracy, adamantly denied by the defendants, has been adequately suggested by the proponents.[17] Plaintiffs' Exhibit D (schedules of economic data tabulating or graphing defendants' revenues and profits on company-wide, local branch, and various competitive market bases). Plaintiffs' proof of a

---

16. The court does not deprecate the stern adversarial role which the State of California has assumed in this litigation. The state attorney general is charged with scrutinizing such settlements in the public interest. The objector has satisfied this weighty assignment herein. The court notes, however, that this is not an antitrust conspiracy directly affecting private individuals of modest means; rather it is a conspiracy which allegedly tended to injure large public and private institutions that had occasion to use armored car services. These behemoths need not rely upon one attorney general but may assert their own objections. Their silence in this case should therefore be read as acquiescence instead of inadequacy.

17. California objects that it has been more severely injured from the alleged conspiracy than other claimants yet must share with them in the fund. First, the court has already concluded that California's damages may have been aggravated by an unrelated conspiracy and that its rights against the West Coast conspirators are unaffected herein. Order entered December 4, 1978. *See* note 12, *supra*. Further, any plan of distribution (a scheme of equal shares or weighted shares) has yet to be presented and argued. California may wish to renew its objections if a later proposed plan does not appear to satisfy its interests.

nationwide conspiracy at trial would be demanding, if not impossible, but plaintiffs' proffer for purposes of class certification for settlement is adequate. *Accord, Wainwright v. Kraftco Corp.*, 58 F.R.D. 9, 12 (N.D.Ga.1973); *In re Four Seasons Securities Laws Litigation*, 58 F.R.D. 19, 31, 39 (W.D.Okl.1972); *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*, 323 F.Supp. 364, 372 (E.D. Pa.1970). The Rule 23(a) requirements of numerosity, commonality, typicality, and representativeness shall be deemed satisfied for the limited purposes of settlement of this litigation. The conditional class, Rule 23(c)(1), as detailed in Settlement Order No. 1 entered April 3, 1978, and as published in the notice to class claimants,[18] may now be deemed the final class for settlement.

■ Upon all of the foregoing, the review of the settlement in light of the ten chosen criteria, the court concludes that the proponents of the settlement have carried their burden. The settlement on behalf of the denominated class of armored car services purchasers may be APPROVED as fair, reasonable, and adequate. Rule 23(e).

### IV. ATTORNEYS' FEES AND EXPENSES

■ Having announced our final approval of the settlement, we may now consider the joint petition for attorneys' fees and expenses submitted by counsel for the named plaintiffs. The Clayton Act provides for the recovery of attorneys' fees and expenses upon successful prosecution of a treble damage action, 15 U.S.C. § 15. No statute expressly allows for recovery of these amounts upon settlement of antitrust litigation and the only authority for reimbursement derives from the "equitable fund doctrine," *see Sprague v. Ticonic National Bank*, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1938); *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1882). The doctrine recognizes that class members who have benefited from counsel's efforts to "create, increase, protect or preserve. . ." *Lindy II*, 540 F.2d at 111, a recovery fund should contribute toward the costs of counsel's services. Just compensation should thus be subtracted from the claimants' recovery fund. The court, while calculating reasonable compensation, must maintain vigilant oversight of the unnamed class members' interests. *Trustees v. Greenough*, 105 U.S. at 536; *Grunin v. International House of Pancakes*, 513 F.2d at 123. The tension that results is the subject of petitioning counsel's and the objectors' continuing argument.

The petitioners seek an award of $1,127,500 in aggregate attorneys' fees and more than $160,000 in disbursements. A single attorneys' fee award is sought upon the understanding that they will later apportion the award pursuant to an agreement among the twenty petitioning law firms here of record.[19] Supplemental Memorandum of Objections of the State of Ohio, filed July 11, 1977, Exhibits A and B. The applicants contend that they have worked in concert as one law firm in this litigation

---

**18.** The notice did not offer a take-it-or-leave-it choice to potential class members. Instead the recipients were notified of the options: (i) of tendering claims to participate in the settlement proposal, (ii) of opting out of the class and pursuing individual remedies, or (iii) of remaining in the class but objecting to the settlement terms. No cognizable rights were compromised upon a decision to be excluded from the settlement class or upon the choice to remain in the class but object to the settlement. *Compare In re General Motors Engine Interchange Litigation*, 594 F.2d 1106 (7th Cir. 1979) (subclass members were compelled to waive their federal right of action upon a decision to opt out) *with Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*,

323 F.Supp. 364, 373 (E.D.Pa.1970) (tentative class members' rights were not determined by the mere submission of the settlement proposal for approval as the proposal allowed opportunities for exclusion from class and objection to the settlement).

**19.** Twenty law firms or groups have submitted claims in the joint application for attorneys' fees. The Office of Attorney General for the State of Connecticut has been listed among counsel of record in *Connecticut v. Brink's, Inc.*, C.A. No. 77–1878, but seeks no share in the award. Counsel has been separately retained in *Hillman's, Inc. v. Brink's, Inc.*, C.A. No. 77–1880; *see* note 4, *supra*, and has not joined the united petition.

and thus a joint award is warranted. *See Miller v. Fisco*, [1978] Fed.Sec. (CCH) ¶ 96,-348 (E.D.Pa.1978). They argue in support of the amount of the fee request that it equals slightly less than 10% of the principal, which would be substantially less than a contingent fee award. The amount reflects a multiplication of their customary fee (calculated as attorney hours times usual hourly rate) by a factor of approximately three, *see Wolf v. Frank*, 555 F.2d 1213, 1218 (5th Cir. 1977); *Grinnell I*, 495 F.2d at 471; *Lindy II*, 540 F.2d at 118. This multiplication produces an overall hourly rate for the petitioners of about $300 per hour.

Petitioners submit that considerations which should influence the court's evaluation of their request include: the generous result obtained, the contingent nature of the fee, the customary contingent fee, the unusual skill requisite to perform legal services so promptly, and counsel's experience, reputation, and ability. *Grinnell I*, 495 F.2d at 470–71; *Johnson v. Georgia Highway Express Co.*, 488 F.2d 714, 717–19 (5th Cir. 1974). They supply a narrative of their litigation efforts and claim that it is

> doubtful that any other set of lawyers would have been sufficiently imaginative to approach the litigation in this manner, or if they had been inclined to do so, would have had the standing and the ability to dispose of it in this fashion . . . . ,

Joint Application for Counsel Fees, filed May 26, 1978, at 15–16, and that

> [t]his settlement was obtained only because plaintiffs' lead counsel had the experience, the ability and the standing and were known to the distinguished defense counsel . . . to be capable of conducting, and to be willing to conduct this litigation to a conclusion.

*Id.*, at 18.

In addition to the narrative and argument, applicants have submitted summaries of individual counsel's experience and credits, schedules of attorney time and regular billing rates, schedules of out-of-pocket expenses, and affidavits of each firm's senior

counsel attesting to the truth and veracity of the fees and expenses claimed. The schedules, they argue, afford the necessary detail of how many hours were devoted to which tasks by whom for the court's review and assessment. *See Lindy I*, 487 F.2d at 167. They note that the claims of the few objectors to the petition represent less than one-third of one percent of the claims to the fund and that the major claimants have interposed no opposition to the amount of the requested award. Similarly, they remark that their $1,127,500.00 fee request might be almost fully paid out of the interest which has and will accrue to the deposited fund. Upon all of these contentions and support, they urge that their joint application is eminently fair and reasonable.

Objections to the joint application have been filed by the States of California and Ohio (with the State of Arizona concurring) and the Penn Central National Bank.[20] These challengers contend that the petitioners' request is excessive and that it is inadequately documented, overinclusive, and impermissibly calculated and presented. The State of Missouri, a settling plaintiff, in an apparent stroke of conscience, has affirmed the objectors' charges before the court.

We announced at the fairness hearing on January 25, 1979 that a decision on the attorneys' fee request could be rendered upon the documentary evidence and written arguments which had been submitted by the petitioners and objectors. No opposition was voiced to this method of proceeding.

The court is now faced with what appears from all the circumstances of this litigation to be an embarrassingly exorbitant attorneys' fee request. We are disappointed and even sorely discouraged that an application of this magnitude has been tendered in the instant actions. The applicants have regretfully fulfilled the most dire predictions of wary courts and commentators. *See Grinnell II*, 560 F.2d at 1098–99; *In re Sugar Industry Antitrust Litigation*, M.D.L. No. 201, slip op. at 16 (N.D.Cal. May 10,

---

**20.** The Atlantic Richfield Company appeared to second the objectors' complaints with the joint

fee petition at the fairness hearing on January 25, 1979. Tr. at 82, 91.

1978); *Illinois v. Harper & Row Publishers, Inc.,* 55 F.R.D. 221, 224 (N.D.Ill.1972); Dawson, *Lawyers and Involuntary Clients in Public Interest Litigation,* 88 Harv.L.Rev. 849 (1975); *Computing Attorney's Fees in Class Actions: Recent Judicial Guidelines,* 16 B.C.Ind. & Com.L.Rev. 630 (1975). What might be overlooked as naïve exuberance among fledgling attorneys is not easily forgiven when accomplished in the name of such experienced officers of the court. Having thus commented, we will proceed with our review and will seek to determine a reasonable hourly rate and to identify reimbursable categories of time.

The Supreme Court, in inaugurating the common fund doctrine, cautioned that these attorneys' fee awards must be "made with moderation and a jealous regard to the rights of those who are interested in the fund." *Trustees v. Greenough,* 105 U.S. at 536. Heedless of this warning, attorneys have requested and courts have granted seemingly "windfall" awards, *Grinnell I,* 495 F.2d at 473, and have suffered the criticism and scorn of the general public. *See Free World Foreign Cars, Inc. v. Alfa Romeo,* 55 F.R.D. 26, 30 (S.D.N.Y.1972). The court's task, then, is difficult but unavoidable:

> We said in the beginning that the question was delicate and embarrassing and this is so not only because we recognize the ability of the attorney who rendered the services but also because of the high standing and character of the three lawyers who testified in support of the allowance. And we might also add this is so because of our respect for the ability and integrity of Judge Barnes, who fixed the allowance. Notwithstanding, the fabulous amount allowed is shocking to our sense of reason and justice.

> . . . . .

> And we are disturbed because in our sober judgment this exorbitant allowance, if it should become a precedent, is calculated to bring both the bar and the bench into public disrepute. More than that, the possibility that the anti-trust laws might develop into a racketeering practice should not be enhanced by the allowance of exorbitant and unreasonable attorney fees.

*Milwaukee Towne Corp. v. Loew's, Inc.,* 190 F.2d 561, 569–70 (7th Cir. 1951), *cert. denied,* 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680 (1952), *quoted in Grinnell II,* 560 F.2d at 1099.

There are two incidents which epitomize the cause for the court's impatience with petitioners' request: the first, self-revelatory and the second, disclosed by settling plaintiff, State of Missouri. At the time this court authorized settlement negotiations and again at the time we entered Settlement Order No. 1, counsel were put on the clearest, sternest notice that a settlement proposal would have to be solidly supported and roundly justified before settlement could be approved. Plaintiffs' counsel acknowledged our admonition, assured us that our demand would be met, and verified a schedule of briefing. On September 18, 1978, at the first hearing convened to determine the fairness, adequacy, and reasonableness of the settlement, the court had before us two submissions from plaintiffs and the filings of the four objectors. The two plaintiff submissions were: a 21-page memorandum in support of the settlement and an over 200-page (including exhibits and supplements) joint petition for attorneys' fees. The memorandum attached no evidentiary material but consisted solely of a recapitulation of the settlement terms, arguments, and the author's suggestion that price comparisons of the conspiracy and post-conspiracy years were inconclusive. The fee petition was neatly bound, carefully indexed, and professionally presented. It had been faithfully supplemented up to the moment of the hearing. The harmful presumption was clear.

The memorandum in support of the settlement was patently insufficient and counsel were dispatched with a list of economic analyses which might prove helpful to the court. Order entered September 20, 1978, at 1, 2. Counsel returned to a hearing on January 25, 1979 with the evidentiary support vital to the court's review of the settlement. The then proffered analyses and

arguments were thorough, instructive, and grounds for approval of the settlement. But the previous presumption could not be dispelled.

The second tainted incident was marked when the Attorney General for the State of Missouri objected to the fee petition as excessive and forwarded to the court a copy of a letter previously sent to lead counsel detailing Missouri's objections. The Attorney General charted the various firms' fee requests compared with the fee customarily earned. The chart revealed that while in some cases counsel expected fees based on the announced multiplier of 2.8–3.0, in other cases the award would be more than four, five, or even six times the hourly rate. The state's attorney urged that such recovery would be unfair and not in the best interests of the class.

At the January fairness hearing the State of Missouri renewed its objection to the form and the amount of the fee petition. The state's representative remarked that under the present scheme the Attorney General's Office would receive $15,000 for $4,000 worth of lawyer time, while its client, the State of Missouri, would receive no more than $6,000 from the claimants' fund. January 25, 1979 hearing, Tr. 97–98. Petitioners have never directly countered the force of these damaging comparisons.

These two incidents deny the petitioners' claim to a munificent award. A just award will only be entered after careful exercise of our role as overseer and after critical application of the factors for awarding attorneys' fees from an equitable fund.

 Our charge is to continue as the "guardian of the rights of absent class members. . . ." *Grunin v. International House of Pancakes*, 513 F.2d at 123, and to be assured that the expenses claimed are for efforts to create, increase, or protect the settlement fund. *See* Manual for Complex Litigation, Part 1, § 1.47 (rev.ed.1977); Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds*, 87 Harv.L.Rev. 1597, 1626 (1974). The "touchstone" then is an evaluation of "the actual effort made by the attorney to benefit the class." *Grinnell II*, 560 F.2d at 1099.[21] The petitioners hold the burden of demonstrating that their billed time and expenses served to benefit the fund. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d at 720. The court will measure the petitioners' efforts against the standards of *Johnson, see also* ABA Code of Professional Responsibility, DR2–106, and will assay the various categories of work according to recent guidelines.

 In *Johnson*, the Fifth Circuit enunciated a series of twelve factors for the trial court's consideration in awarding attorney's fees. Although *Johnson* was a civil rights action, the factors have been adopted and applied in a multitude of other suits including antitrust treble damage actions, *see e.g., Wynn Oil Co. v. Purolator Chemical Corp.*, 391 F.Supp. 522 (M.D.Fla.1974). The *Johnson* factors, when coupled with the criteria for augmenting an award under exceptional circumstances, *Wolf v. Frank*, 555 F.2d 1213, 1218 (5th Cir. 1977), parallel the process of determining a "lodestar" amount and a "multiplier" employed by other courts, *see Grinnell II*, 560 F.2d at 1098; *Lindy I*, 487 F.2d at 167. *Johnson, Grinnell*, and *Lindy* require a two-step review: first, the calculation of a customary fee from the identification and multiplication of an attorney's reasonable hourly rate times a compensable number of hours; and, second, the determination of whether an increase or reduction of these expenses is justified in light of the risk of litigation and the quality of work performed.

---

21. Courts have also been guided in determining attorneys' fee awards by a need "to stimulate the motive for representation of classes . . ." Manual for Complex Litigation, Part 1, § 1.47(a) (rev.ed.1977). This need has been apparent in some civil rights actions. *See NAACP v. Button*, 371 U.S. 415, 443, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 719 (5th Cir. 1974). Nationwide antitrust class actions appear more desirable among the organized bar and the need to stimulate representation is less evident. The court therefore will rely more heavily on the principle of benefit to class than upon consideration of encouraging class representation in fashioning this attorneys' fee award.

As a predicate to this two-step review, the court must consider the propriety of petitioners' "joint" form of fee application. The joint application attempts to evade the necessary scrutiny of our review by disguising the rate, hours, and multiplier of individual attorneys in an undifferentiated mass. *See* Letter from Assistant Attorney General, State of Missouri, to the court, dated January 19, 1979. The applicants submit in support of this form of fee request that they have performed as a single law firm and that one award is justified. The schedules of hours, however, suggest such duplication of effort, that if they acted as a single firm, the firm stands as a monument to inefficiency. For example, out of a total of 85 attorneys from the 20 firms seeking reimbursement in this litigation, 54 attorneys worked on pleadings and 34 entered court appearances. No private law firm could survive on such redundancy. Treating petitioners as a single law firm entitled to an aggregate fee would reward inefficiency and duplication of effort and thus would be unfair to the class of claimants. A joint award will not be granted. The court, however, will seek to determine reasonable mixed hourly rates [22] on a firm-by-firm basis. Instead of one large aggregate award or eighty-five separate fees, the court will grant twenty law firm awards. Having dispensed with these preliminaries, the court may now proceed with a review of the *Johnson* criteria, 488 F.2d 717–19.

### A. *The Johnson Factors*

■ (1) *The time and labor required.* The number of hours claimed by plaintiffs' counsel is the first area of review. We must not blindly accept the petitioners' statement of hours expended without reference to the time required for such tasks as seen from our experience and vantage point. *Id.* at 717; *In re Sugar Industry Antitrust Litigation*, slip op. at 28. We find the applicants' number of claimed hours generally overstated. Part of this overstatement derives from the severe duplication of effort endemic in this litigation. The court will attempt to correct for the

petitioners' inefficiency by limiting the compensable time for court appearances and preparation of pleadings. Many of the hours charged are for tasks, such as settlement administration, which are more clerical than legal, and, while allowable, must be reimbursed at lesser rates. *See In re Penn Central Securities Litigation*, 416 F.Supp. at 922. Other hours claimed for repeated client conferences accorded limited, if any, benefit upon the class of claimants and must also be proportionally reduced.

(2) *The novelty and difficulty of the questions.* This litigation, settled at such an early stage of the proceedings, presented no questions of first impression. Had the actions gone to trial, plaintiffs would have encountered enormous difficulties of proof and of persuasion. But the actions did not proceed to trial and the attorneys' assignments and work were more mundane than masterful. The petitioners listed the techniques they pioneered in previous multidistrict antitrust litigation (*e. g.* "global" settlements; procedures for class certification by motion, memorandum, and affidavit with a minimum of discovery; the form and manner of class notice), Joint Application for Counsel Fees, at 18, and hoped that "[t]he novel settlement procedure developed in this litigation . . . may likewise become customary." *Id.*, at 19. The court is left to speculate on what that novel procedure might be: settlement amount based on a percentage of sales, settlement proposed without any economic justification, or something else. We must simply conclude that novelty and difficulty were not encountered prior to settlement.

(3) *The skill requisite to perform the legal service properly.* "The trial judge should closely observe the attorney's work product, his preparation, and general ability before the court." *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d at 718. On the one hand, the pleadings and early motions in this litigation demanded little skill from the petitioners. The civil complaints merely rehearsed the charges of the crimi-

---

**22.** The "mixed hourly rate" averages the reasonable rates of senior and novice attorneys and recognizes a variety of legal tasks, from complex to routine.

nal indictments and the original discovery consisted of a review of the Grand Jury documents. The early pretrial proposals for case management and handling were adaptations of previous multidistrict litigation housekeeping rules and did not tax petitioners' legal prowess.

On the other hand, settlement at such an early juncture reflects forceful and effective use of bargaining skills. The lead counsel's experience and reputation may have influenced defendants' early capitulation. The petitioners' first attempt to support and seek approval of the settlement was woefully inadequate. Their second attempt has proven successful. The compilation and presentation of persuasive arguments and evidentiary support favoring a settlement are refinements of general case preparation and briefing skills. Balancing the first disaster with the second success, the court concludes that petitioners' labor and skill in this area were adequate.

(4) *The preclusion of other employment by the attorney due to acceptance of the case.* We have no indication from any of the twenty law firms representing the class claimants that they were precluded from other work by this litigation. Lead counsel were heavily but not completely committed to the progress of these actions; adjunct counsel devoted even less substantial time to the proceedings.

(5) *The customary fee.* Courts have recently awarded these and similarly able lead counsel mixed hourly rates of $72/hour, *Entin v. Barg*, 412 F.Supp. 508, 517 n. 18 (E.D.Pa.1976), $73/hour, *Barr v. WUI/TAS, Inc.*, [1976–1] Trade Cases (CCH) ¶ 60,725 at 68,119 (S.D.N.Y.1976), and $75/hour, *In re Penn Central Securities Litigation*, 416 F.Supp. at 924 n. 52. *But*

see *City of Detroit v. Grinnell Corp.*, [1976–1] Trade Cases (CCH) ¶ 60,913 at 68,982 (S.D.N.Y.1976), *rev'd*, 560 F.2d 1093, 1102 (2d Cir. 1977) (mixed hourly rate for Berger firm which we have calculated at $74/hour, allowed excessive individual fees and could not stand).[23] The mixed hourly rate is an average computed from the reasonable hourly fees of senior and junior attorneys in a firm fulfilling a' variety of legal tasks. The court concludes that a customary mixed hourly fee for lead counsel law firms should not exceed $80/hour.[24] The customary fee for adjunct law firms should reflect a lesser degree of decision-making and a reduced level of responsibility. The court concludes that the mixed hourly fee for these firms should not exceed $65/hour to fall within community standards.[25]

(6) *Whether the fee is fixed or contingent.* The calculation of an attorneys' award on a contingent fee basis in equitable fund cases has been resoundingly rejected. *Lindy II*, 540 F.2d at 119–20; *Grinnell I*, 495 F.2d at 470–71. Determination of the amount of attorneys' fees to be subtracted from an equitable fund is a decision in equity in the nature of a proceeding in *quantum meruit*, and it is not an action in contract for a percentage of the plaintiffs' recovery. *Id.* Petitioners appear to forget these principles when they urge in support of their $1,127,500 request that this aggregate fee "is substantially less than the customary contingent fee. . . . [and] is slightly less than ten percent of the principal amount of the settlement . . . ." Joint Application for Counsel Fees, at 10. The court will not review this request on a percentage basis of recovery, but only upon an evaluation of compensable benefit ren-

---

23. On remand from *Grinnell I*, 495 F.2d 448 (2d Cir. 1974), the district court allowed an hourly rate of $125 for Mr. David Berger. On appeal, the Second Circuit set this award aside on grounds that the hourly rate was excessive. *Grinnell II*, 560 F.2d 1093, 1102 (2d Cir. 1977). In the instant litigation 22 attorneys have claimed hourly rates of $125 and above. Lead counsel seek the following: David Berger, $250/hour; David I. Shapiro, $200/hour; Harold E. Kohn, $250/hour; and John E. Burke, $110/hour.

24. The finding of a mixed hourly lead law firm rate of $80/hour is calculated by setting senior counsel rates at $125/hour, proportionally reducing junior and associate counsel fees, and calculating a weighted average.

25. The mixed hourly adjunct law firm rate of $65/hour derives from setting senior counsel rates at $100/hour and scaling down junior personnel fees accordingly. A weighted average hourly rate is then computed.

dered to the class of claimants. This sixth *Johnson* criterion is thus not pertinent to the instant review.

(7) *Time limitations imposed by the client or circumstances.* No deadlines were imposed by the class of claimants or by the factual circumstances of the action. The petitioners identified a procedural deadline, that settlement should be attempted before a class certification decision was rendered, in order to enhance their bargaining position. This deadline was one of strategy more than compulsion and did not constrain petitioners in the prosecution of the litigation.

(8) *The amount involved and the results obtained.* The settlement bargain, an $11.8 million fund in exchange for ten years of civil peace for the three codefendants, has been shown to be more than adequate in light of the risks of litigation. This generous amount was obtained early in the litigation, thus saving the expense and time of a prolonged antitrust debacle. The amount and speed with which it was obtained are to the credit of petitioners.

(9) *The experience, reputation, and ability of the attorneys.* The senior counsel of the lead and adjunct law firms have been distinguished members of the bar for many years. Their names appear repeatedly as counsel of record in the annals of multidistrict antitrust and securities litigation. It is likely that the defendants weighed petitioner's reputation and experience in the settlement fund calculus.

The acknowledged experience of counsel, however, is a two-edged sword. On the one side, it may account in part for the admirable speed and terms of settlement. On the other, it renders most pretrial matters in this litigation routine and it pretermits any excuses for the first ill-prepared and undocumented memorandum in support of the settlement.

(10) *The "undesirability" of the case.* The court noticed nothing undesirable in the representation of this class of claimants. On the contrary, the fact of sixteen different actions with twenty-two different law firms as counsel of record and with some actions listing as many as four law firms in representation, attests to the financial attractiveness of nationwide antitrust class actions.

(11) *The nature and length of the professional relationship with the client.* This *Johnson* criterion is not applicable to the class representation undertaken in this litigation. Most of the claimants have simply acquiesced pursuant to the class notice in the petitioners' prosecution of their interests. No client-counselor relationship has ever been established.

(12) *Awards in similar cases.* A strict comparison of total awards in other cases would not be meaningful herein. This litigation was settled earlier in the proceedings than any multidistrict antitrust action we have studied. While the *Grinnell* litigation lasted for ten years and the various *Lindy* actions struggled for six to eight years before settlement, the instant parties reached an agreement within months of the original filings and transfer to this court. Settlement was proposed in *Barr v. WUI/TAS, Inc.*, [1976-1] Trade Cases (CCH) ¶ 60,725 (S.D.N.Y.1976), within fourteen months of initiation of the antitrust actions, but as the court noted:

> [u]nquestionably, plaintiffs' attorneys have struggled long and hard against the determined opposition of defense counsel.

at 68, 119. Comparisons of awards in those lengthy and hard-fought cases with what might be requested in this short-lived and undemanding litigation must be cautiously approached. Mindful of this caution, examples of final attorneys' fee award include: *Grinnell* $333,000.00; *In re Penn Central Securities*, $1,295,000.00; and *Barr v. WUI/TAS, Inc.*, $78,500.

More meaningful than a comparison of total awards is a comparison of hourly rates. Based on a consideration of all twelve *Johnson* criteria, placing heavy reliance on the limited time, labor, and skill required in the beginning stages of this well-mapped litigation and on the generous result which counsel are credited with effecting, we hold to our finding of a reasonable mixed hourly rate for lead counsel law firms as $80 per hour and for adjunct law

firms as $65 per hour. Upon this scale, paralegals and law students will be reimbursed at $20 per hour. We draw no distinction between private firm and public employer rates for attorneys, paralegals, and law students. *Cf. In re Sugar Industry Antitrust Litigation*, slip op. at 31. The court must now proceed to assay what lawyering tasks are compensable and must determine whether augmentation of the attorneys' fees is suggested.

### B. *Compensable Hours*

■ Some categories of work are not reimbursable on general principles of equitable fund recovery and other categories should not be recompensed under the circumstances of this litigation. These two classes of hours must be identified and subtracted from the petitioners' request.

Included in the first categories of nonreimbursable time are the hours counsel have spent in preparation of the fee petition. *Grinnell II*, 560 F.2d at 1102; *Lindy II*, 540 F.2d at 111; *Computer Statistics, Inc. v. Blair*, 418 F.Supp. 1339, 1350 (S.D. Tex.1976). The attorneys' efforts in preparation of the joint fee request neither created nor protected the settlement fund to the benefit of the class. This time was, if anything, antagonistic to the claimants' recovery and cannot be repaid under equitable fund theories.

■ Working hours identified in only vague and meaningless terms, such as "general," "miscellaneous," or "special services," should not be charged to an involuntary class of claimants. *In re Sugar Industry Antitrust Litigation*, slip. op. at 28. Indefinite documentation might be acceptable in the understandings developed over years of extended lawyer-client relationships but may not be allowed under the equitable fund theory of this nationwide class action.

■ Similarly, time expended in client conferences reasonably benefited the individual named plaintiffs but could not greatly assist the passive members of the class. The court will allow a total of two hours consultation time per client to account for any generalized investigation which may have assisted the class. If several firms represented the same client and billed for client conference time the two hour maximum will be divided among them equally. If counsel are willing to detail their client conference time and to explain what benefits may have accrued to the class, the court will consider augmenting this category in individual cases. These details and explanations must be FILED with the court by May 1, 1979 to be considered.

■ Settlement administration hours will be reimbursed, but at a lower hourly rate. These hours were spent at more ministerial then legal tasks and should be compensated accordingly. "Such non-legal work may command a lesser rate. Its dollar value is not enhanced just because a lawyer does it." *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d at 717. The court will reimburse settlement administration hours at the rate of $50 per hour. *See In re Penn Central Securities Litigation*, 416 F.Supp. at 922.

■ Finally, in an attempt to adjust for the severe duplication of effort in this litigation, the court will limit the total number of hours claimed by the twenty law firms for preparation of pleadings and briefs and for court appearances. There is no reason or excuse for penalizing the class claimants for counsel's inefficiency. The complaints filed were simple parrotings of the criminal indictment; the early briefs were mere arguments against extensions of time. The proposed Settlement Order No. 1 was an adaptation of clerical and management procedures devised and employed in prior similar multidistrict actions. The briefs in support of settlement were, at first, "patently insufficient," Order entered September 20, 1978, and only on a second try, proved persuasive. The "court, using its own firsthand knowledge of the nature of these tasks, has reduced and/or apportioned duplicative time." *In re Sugar Industry Antitrust Litigation*, slip op. at 28. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d at 717. The court finds that the pleadings and briefs filed in this action in aid of the class reflect approximately 280 hours of attorney work. The four lead counsel firms

shall recover no more than 50 hours each and adjunct firms no more than 5 hours each for these filings.

In like manner, the court will reduce the totals of court appearance time claimed. We have spent no more than 6 hours in court in this litigation and have cause to wonder how some individual petitioners propose to bill in excess of 92 hours for this category of work. Joint Application for Counsel Fees, Exhibit G–17 and Supplement. The court will grant lead counsel some time for preparation for appearances in court and will allow each firm to be reimbursed for 20 hours. We will limit adjunct firms to 6 hours each for these appearances.[26]

### C. *Augmentation of the Fee*

Once a reasonable hourly rate has been established and a compensable number of hours identified, the attorneys' fee can be calculated. In special circumstances courts have augmented or multiplied the calculated fee when the risks of undertaking the litigation were great and the quality of work evinced was superior. *Wolf v. Frank*, 555 F.2d at 1218; *Lindy II*, 540 F.2d at 117.

Perhaps the foremost of these factors is the attorney's "risk of litigation," *i.e.,* the fact that, despite the most vigorous and competent of efforts, success is never guaranteed. The greater the probability of success, of either ultimate victory on the merits or of settlement, the less this consideration should serve to amplify the basic hourly fee. The tangible factors which compromise the "risks of litigation" might be determined by asking the following questions: has a relevant government action been instituted or, perhaps, even successfully concluded against the defendant; have related civil actions already been instituted by others; and are the issues novel and complex or straightforward and well worn?

*Grinnell I*, 495 F.2d at 471. Upon this analysis, no multiplier is suggested. The contours of this litigation were previously drawn by the Government's actions. Petitioners "could not have been in suspense for any appreciable length of time. . . ." *Grinnell II*, 560 F.2d at 1101, as settlement was reached with all three codefendants before the first pretrial conference. A notable risk of litigation, the obstacle to maintaining the action as a class action, was not felt, as the Court of Appeals did not announce *Alabama v. Blue Bird Body Co., see Part III, supra,* until after the settlement agreement was executed. No novel or complex issues were faced prior to settlement. The contingency factors which have justified a multiplier in other actions were absent from this litigation.

The second part of an augmentation consideration, that is, the exceptional quality of the work performed, is also lacking herein. Counsel will be duly rewarded for their experience, reputation, and ability in the mixed hourly rates that we have established. Enhancement of those rates is only authorized when the work is of a superior quality. *Lindy II*, 540 F.2d at 118; *Wolf v. Frank*, 555 F.2d at 1218. As the court and, presumably, the class of claimants are still reeling from the grossly inadequate first attempt to support the settlement, we are not inclined to allow an extraordinary award. Upon both parts of the test, therefore, petitioners' request for a multiplier of their customary fees must be denied.

### D. *Expenses*

The court will reimburse the out-of-pocket expenses of the petitioners from the settlement fund. The affidavits of expenses are sufficient for all but the travel, meals, and lodging requests. We find those claims to be excessive and will not authorize reimbursement without further documentation. As a premise the petitioners should

---

**26.** The court may be overindulgent in allowing adjunct counsel who did not participate in the court proceedings to recover for this time. Counsel were more likely guarding their individual clients' interests than benefiting the class by attendance at these hearings. *See In re Sugar Industry Antitrust Litigation*, M.D.L. No. 201, slip op. at 28 and n.29 (N.D.Cal. May 10, 1978).

---

assume their class clients have agreed to pay modest to moderate travel and per diem costs when the trip served their beneficial interests. Petitioners should not expect to recover from their involuntary clients for unnecessary or extravagant travel and related expenses. Overstaffing at meetings, conferences, or court appearances will not be rewarded, *see In re Sugar Industry Antitrust Litigation*, slip op. at 28–29, lavish dining (*e.g.*, $75 meal for one, Joint Application for Counsel Fees, Exhibit H–6) will not be underwritten. As time spent in conferences with individual clients has been reduced, so too will travel expenses to meet with these clients.

As documentation, the court will require a statement for each claimed trip of: when, where, why (*e. g.*, meeting, conference, appearance), and with whom (with which attorneys from the same and from other law firms). The court will expect the submission: of copies of receipts for economy air fare, moderately-priced hotel rooms and meals; of statements of ground transportation costs; and of details of any related expenses. If counsel lacks the pertinent records, an explanation of their unavailability may be tendered along with an estimate of expenses for the court's review. All documented travel and attendant expenses incurred to date shall be FILED with the court on or before May 1, 1979 or they will be deemed abandoned.

### E. *The Petitioners' Award*

The court has charted the requests, the reimbursable and nonreimbursable claims, and the presently payable expenses for the twenty petitioning law firms. The charts appear as the Appendix to this order. The petitioners' awards are summarized in the following table:

| | Total Attorneys' and Paralegals' Fees | Expenses Now Payable |
|---|---|---|
| **Lead Counsel:** | | |
| Berger & Montague, P.C. | $64,437.50 | $22,240.20 |
| Dickstein, Shapiro & Morin | $69,535.00 | $41,798.89 |
| Kohn, Savett, Marion & Graf, P.C. | $23,702.50 | $18,206.90 |
| Ross, Hardies, O'Keefe, Babock & Parsons | $23,239.00 | $18,419.77 |
| **Adjunct Counsel:** | | |
| Adler, Barish, Daniels, Levin & Creskoff | $ 2,778.75 | $ 76.36 |
| Davis, Matthews & Quigley | $ 7,603.50 | $ 2,303.24 |
| Gross & Sklar, P.C. | $ 7,216.25 | $ 352.57 |
| Illinois Attorney General | $ 8,166.00 | $ 93.20 |
| Kendrick, Netter & Bennett (with Brandlin & McAllister) | $ 6,470.75 | $ 452.92 |
| Kleinman, O'Neill, Steinburg & Lapuk | $ 1,436.50 | –0– |
| Litman, Litman, Harris & Specter | $ 3,347.50 | $ 223.26 |
| Macey & Zusmann | $ 4,961.00 | $ 189.90 |
| Mandell & Wright | $ 2,015.00 | $ 294.31 |
| Massachusetts Attorney General | $ 9,163.75 | $ 470.05 |
| Missouri Attorney General | $ 2,669.00 | –0– |
| Fred W. Phelps—Chartered | $ 5,005.00 | $ 379.99 |
| Saveri & Saveri | $ 2,226.25 | –0– |
| Specks & Goldberg | $ 3,233.75 | $ 42.97 |
| Wallace & Breslow | $ 9,808.50 | $ 50.75 |
| Wolf, Block, Schorr & Solis-Cohen | $ 4,641.00 | $ 94.74 |

## V. OUTSTANDING MATTERS

### A. *The Distribution Plan*

Having approved the settlement and established the attorneys' fee award and partial expenses, the court may now schedule the sequence of distribution planning and presentation. Lead counsel shall FILE a plan for distribution of the settlement fund by May 8, 1979. The court will then review the plan and determine whether it is acceptable for submission to members of the class who filed claims against the fund. If deemed acceptable, the plan and notice of a hearing on distribution shall be mailed to all claimants by May 15, 1979. The notice shall announce that a hearing on the distribution plan is scheduled for 10:00 A.M., Monday, June 11, 1979, in the United States Courthouse, Room 324, 56 Forsyth Street, N.W., Atlanta, Georgia. The notice shall also state that anyone wishing to object to the proposed plan must file a written objection with the court by June 4, 1979 and must file a statement of an intent to appear at the hearing if the objector also wishes to present his arguments in person, by the same date.

### B. *The State of Maryland Civil Action*

Because the court has approved the settlement of the sixteen civil actions, retention in this district of the seventeenth action, the recently transferred *State of Maryland v. Brink's, Inc.*, C.A. No. 79–133, appears inadvisable. The convenience of the parties and witnesses and the interests of justice, *see* 28 U.S.C. § 1404(a), will be better served by retransfer of this seventeenth action to the site of original filing, the District of Maryland. Investigations of the alleged conspiracy's impact and damage will require discovery from state agency files and defendants' local branch offices. These and other pretrial matters can be better monitored in the home state, Maryland, than in this forum. Once settlement of the sixteen other actions was approved, most ties to this district were effectively broken and the reason for original transfer was lost. The court will RETRANSFER the *State of Maryland* action to the District of Maryland within ten (10) days of the date of this order. Any objections to retransfer must be filed within that period to be considered.

Accordingly, the court hereby: (1) APPROVES the settlement of *In re Armored Car Antitrust Litigation*, C.A. No. 78–139, and all the civil actions included therein with the exception of *State of Maryland v. Brink's, Inc.*, C.A. No. 79–133; (2) DENIES the motion of the State of California to reopen discovery on the issue of damages; (3) DENIES the request of the State of California for a court-appointed expert; (4) GRANTS plaintiffs' counsel's application for attorneys' and paralegals' fees and for out-of-pocket expenses in the following amounts:

| | Total Attorneys' and Paralegals' Fees | Expenses Now Payable |
|---|---|---|
| **Lead Counsel:** | | |
| Berger & Montague, P.C. | $64,437.50 | $22,240.20 |
| Dickstein, Shapiro & Morin | $69,535.00 | $41,798.89 |
| Kohn, Savett, Marion & Graf, P.C. | $23,702.50 | $18,206.90 |
| Ross, Hardies, O'Keefe, Babock & Parsons | $23,239.00 | $18,419.77 |
| **Adjunct Counsel:** | | |
| Adler, Barish, Daniels, Levin & Creskoff | $ 2,778.75 | $ 76.36 |
| Davis, Matthews & Quigley | $ 7,603.50 | $ 2,303.24 |
| Gross & Sklar, P.C. | $ 7,216.25 | $ 352.57 |
| Illinois Attorney General | $ 8,166.00 | $ 93.20 |

| | Total Attorneys' and Paralegals' Fees | Expenses Now Payable |
|---|---|---|
| **Adjunct Counsel:** | | |
| Kendrick, Netter & Bennett (with Brandlin & McAllister) | $ 6,470.75 | $ 452.92 |
| Kleinman, O'Neill, Steinburg & Lapuk | $ 1,436.50 | —0— |
| Litman, Litman, Harris & Specter | $ 3,347.50 | $ 223.26 |
| Macey & Zusmann | $ 4,961.00 | $ 189.90 |
| Mandell & Wright | $ 2,015.00 | $ 294.31 |
| Massachusetts Attorney General | $ 9,163.75 | $ 470.05 |
| Missouri Attorney General | $ 2,669.00 | —0— |
| Fred W. Phelps—Chartered | $ 5,005.00 | $ 379.99 |
| Saveri & Saveri | $ 2,226.25 | —0— |
| Specks & Goldberg | $ 3,233.75 | $ 42.97 |
| Wallace & Breslow | $ 9,808.50 | $ 50.75 |
| Wolf, Block, Schorr & Solis-Cohen | $ 4,641.00 | $ 94.74 |

(5) ORDERS plaintiffs' counsel to file by May 1, 1979, the described documentation of any unrewarded client conference time and/or of any travel and related expenses; failure timely to file the ordered documentation will effectively waive these requests; (6) ORDERS lead counsel to file by May 8, 1979, a proposed plan of distribution of the settlement fund and a proposed notice to all claimants of the plan, hearing, and opportunity to file objections and statements of intended appearance; and (7) ORDERS RE-TRANSFER within ten (10) days of this date of *State of Maryland v. Brink's, Inc.*, C.A. No. 79–133, to the District of Maryland, the district of original filing, subject to timely objection.

IT IS SO ORDERED, this 18th day of April, 1979.